794 F.2d 29
 122 L.R.R.M. (BNA) 2953, 104 Lab.Cas. P 11,982
 Brian EATZ, Edward McMillan, Peter Albrechtsen and Sonny
Pascale, individually on their own behalf and on
behalf of all persons similarly
situated, Plaintiffs-Appellants,
v.
The DME UNIT OF LOCAL UNION NUMBER 3 OF the INTERNATIONAL
BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO; Local Union
Number 3 of the International Brotherhood of Electrical
Workers, AFL-CIO; and the New York Racing Association,
Inc., Defendants-Appellees.
 No. 820, Docket 85-7835.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 21, 1986.
Decided June 19, 1986.
 
 Wendy E. Sloan, New York City (Hall & Sloan, of counsel), for plaintiffs-appellants.
 H. Richard Schumacher, New York City (Cahill Gordon & Reindel, Henry Bisgaier, Andrew P. Marks, of counsel), for defendant-appellee The New York Racing Ass'n.
 Norman Rothfeld, New York City, for defendant-appellee Local Union Number 3 of the Intern. Broth. of Elec. Workers, AFL-CIO.
 Before OAKES, KEARSE and PRATT, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 When a union moves to dismiss an action against it, federal labor policy requires courts to construe liberally allegations that the union has breached the duty of fair representation owed to its members. Because the record revealed numerous instances of alleged unfair representation occurring both within the applicable limitations period and after the filing of the complaint, the district court should not have limited its analysis to the complaint alone and, therefore, erred in granting defendants' motions to dismiss this action as time-barred.
 
 
 2
 Plaintiffs, mutuel clerks employed by The New York Racing Association, Inc. ("NYRA"), brought a class action against NYRA, their union, Local Union Number 3 of the International Brotherhood of Electrical Workers, AFL-CIO ("Local 3"), and their bargaining unit, the DME Unit of Local 3 ("DME"). Local 3 and DME are sometimes hereinafter referred to collectively as the "union". Plaintiffs alleged initially that the union had breached its duty of fair representation in negotiating and administering its 1977, 1979, and 1982 collective bargaining agreements with NYRA by drawing invidious and arbitrary distinctions among NYRA's mutuel clerks and unfairly discriminating against plaintiffs' class. Plaintiffs alleged further that NYRA had acted in concert with the union in the union's breach of its duty of fair representation.
 
 
 3
 Defendants moved to dismiss the action under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, or alternatively, for judgment on the pleadings under Fed.R.Civ.P. 12(c) or summary judgment under Fed.R.Civ.P. 56 on the ground that the complaint was time-barred under the applicable six-month limitations period. The United States District Court for the Eastern District of New York, Mark A. Costantino, Judge, dismissed on the latter ground. Notwithstanding plaintiffs' contention that the breach was ongoing and persisted beyond the ratification and execution of the collective bargaining agreements, the district court found that the claims arose at the very latest when the 1982 agreement was ratified and that, as a result, the filing of the complaint more than six months thereafter was untimely.
 
 
 4
 While this conclusion may have been justified by a reading of only the complaint, it was not proper in light of plaintiffs' opposing affidavits. The allegations expressed in those affidavits, which comprised a significant portion of the record below, describe several union and NYRA activities, some occurring within the limitations period and some after the filing of the complaint, by which the union may have breached its duty of fair representation. We therefore hold that the district court erred in dismissing the complaint, and we reverse and remand for further proceedings.
 
 BACKGROUND
 
 5
 NYRA, a nonprofit racing association organized under the laws of New York State, owns and operates three thoroughbred horse-racing tracks within the state--Aqueduct in Queens County, Belmont Park in Nassau County, and Saratoga in Saratoga Springs. Mutuel clerks, NYRA's largest employee group, staff NYRA's pari-mutuel wagering facilities. Most mutuel clerks work at the betting windows selling or redeeming tickets that evidence bets on the races; some perform related support functions.
 
 
 6
 Until 1977 NYRA employed only two categories of mutuel clerks: the full-time "Regulars" and the casual, or part-time, "Extras". However, the 1977 labor contract between NYRA and DME's predecessor recognized a new full-time category termed "Provisionals". This new category was continued in the 1979 and 1982 collective bargaining agreements between NYRA and DME, but was relabeled as "New Regulars".
 
 
 7
 Regulars are distinguished from New Regulars in that they achieved their full-time employment status before the effective date of the 1977 agreement. The distinction is significant because of the two-tiered system of wages and other benefits for full-time mutuel clerks, which, under the collective bargaining agreements, generally provides Regulars with higher wages and more favorable fringe benefits than New Regulars. It is precisely this disparity that prompted plaintiffs to bring the instant class action.
 
 
 8
 The complaint, filed on March 3, 1983, claims that DME and NYRA, through the negotiation, execution, enforcement, and administration of the collective bargaining agreements, have continually treated the New Regulars as an inferior class to be exploited and manipulated for the mutual benefit of NYRA and the Regulars. In support and elaboration of their claims, plaintiffs described in their affidavits numerous instances occurring both before and after ratification of the 1982 collective bargaining agreement, in which the union allegedly breached its duty to represent fairly the minority class of New Regulars.
 
 
 9
 The provisions of the 1982 collective bargaining agreement were ratified in substance by the union on January 26, 1982, but the document was not fully signed until approximately one year later. In the interim the New Regulars claim to have repeatedly protested to the leadership and membership of DME regarding the discriminatory nature of the agreement and the absence of union representation for the New Regulars. Plaintiffs contend that, as a result of complaints voiced at an October 1982 membership meeting and of named plaintiff Brian Eatz's subsequent correspondence on their behalf with union executives, when the union signed the 1982 agreement it had full knowledge of the agreement's allegedly discriminatory nature.
 
 
 10
 In addition to events relating to the negotiation and execution of the 1982 agreement, the record before the district court described other, more recent situations in which the union allegedly breached its duty to represent plaintiffs fairly. Four such situations are especially relevant in determining whether plaintiffs' action was timely commenced.
 
 
 11
 First, plaintiffs allege that NYRA has continually failed to enforce, and DME has continually failed to honor, a provision of the collective bargaining agreement limiting the number of scheduled days off, or "offs", that Regulars may take on any one weekday to 20 or 25% (depending on whether there is Sunday racing) of total scheduled "offs". If these limits were enforced, some additional weekday jobs would become available to the New Regulars. Plaintiffs maintain the reason this provision has not been enforced or honored is that to do so would benefit the New Regulars at the expense and inconvenience of some Regulars.
 
 
 12
 Second, plaintiffs allege that the union acted in an unlawful discriminatory manner at the Saratoga meets in 1982 and 1983. Apparently because mini-dealer jobs, one of several job classifications for mutuel clerks, pay a daily wage bonus, the Regulars, who have seniority rights, pick the mini-dealer jobs at the Aqueduct and Belmont Park meets, and thereby exclude New Regulars from these jobs. At the end of the Saratoga meets, however, the longer hours required by these jobs render them less desirable. On the last day of the 1982 Saratoga meet, NYRA summoned approximately 40 New Regulars in order to fill approximately 20 mini-dealer jobs then being vacated by Regulars who were anxious to return home. Eatz and Peter Albrechtsen, who were among the approximately 20 New Regulars who refused the one-day jobs, were subsequently threatened by the union with lost pay and were reprimanded by NYRA.
 
 
 13
 Soon after the start of the 1983 Saratoga meet, NYRA assigned the 20 least-senior New Regulars to mini-dealer jobs; only seven of them were notified in advance that it might become necessary to take such assignments. These assignments became available when Regulars, who had initially chosen the jobs, changed their minds after the meet began. Several of these New Regulars complained to executive board members about the inequity of requiring New Regulars to take these jobs at Saratoga while they are unavailable to them at Aqueduct and Belmont Park. After meeting with NYRA management personnel, the executive board responded with an ultimatum: either accept the mini-dealer assignments at Saratoga or be subject to disciplinary suspension.
 
 
 14
 Third, in order to persuade Clem Imperato, NYRA's primary supervisor of mutuel clerks, not to allocate 24 of the preferred clubhouse windows to New Regulars for purposes of the 1983 Belmont job pick, the union agreed to amend the 1982 collective bargaining agreement in a way that adversely affected New Regulars. Originally, the agreement had provided that a New Regular's job assignment could be moved only once in a day. The amendment, the terms of which were contained in a notice regarding the Belmont pick, provided that NYRA could move a New Regular to a different betting window within his "bay", or working area, even though he had already been moved that day.
 
 
 15
 Finally, DME in 1983 attempted to settle a sex-discrimination lawsuit by offering the entire class of female-member plaintiffs placement on the seniority list ahead of all New Regulars but behind all Regulars. In order to avoid the adverse effect of this proposed settlement the New Regulars retained counsel and intervened in the action, and ultimately, the settlement placed the female class members on the seniority list strictly according to the dates on which they had applied for employment.
 
 
 16
 Defending against plaintiffs' allegations, NYRA contends that the disparate contractual treatment of Regulars and New Regulars is an intended result of the collective bargaining agreements and merely reflects the different economic conditions existing when each group attained full-time employment status. Defendants explain that the Regulars were "red-circled", or exempted, so that they could continue to receive the higher wages and benefits available to them before a changing economic climate had an impact upon the hiring market.
 
 
 17
 NYRA characterizes the allegedly discriminatory actions taken by itself and the union against the New Regulars after ratification of the 1982 collective bargaining agreement as "evidentiary trivia with no independent significance for any issue in this case." NYRA contends that because none of these acts is expressly mentioned in the complaint, they are unrelated to the relief plaintiffs seek and, therefore, are irrelevant to the statute of limitations issue.
 
 
 18
 On the authority of DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the district court applied to this case the six-month limitations period set forth in Sec. 10(b) of the National Labor Relations Act ("NLRA"), 29 U.S.C. Sec. 160(b) (1982). Viewing plaintiffs' claim as one for breach of duty by the union in negotiating the collective bargaining agreements, Judge Costantino held the complaint, filed on March 3, 1983, to be time-barred, because "plaintiffs' cause of action arose, at the very latest, on or about the time of the ratification of the 1982 Agreement, that is, January 26, 1982".
 
 DISCUSSION
 
 19
 We agree with Judge Costantino that the DelCostello Court's analysis of the limitations provision in Sec. 10(b) of the NLRA applies equally to this case. Section 10(b) provides in relevant part that "no complaint shall issue based upon any unfair labor practice occurring more than 6 months prior to the filing of the charge with the [National Labor Relations] Board and the service of a copy thereof upon the person against whom such charge is made." 29 U.S.C. Sec. 160(b) (1982). In DelCostello the Supreme Court held that this provision, which when read literally relates only to filing charges with the National Labor Relations Board, should also apply to so-called "hybrid" cases in which employees sue both their employer for breach of the collective bargaining agreement pursuant to Sec. 301(a) of the Labor Management Relations Act, 29 U.S.C. Sec. 185(a) (1982), and their union for breach of its duty of fair representation in mishandling the related grievance and arbitration proceedings. See DelCostello, 462 U.S. at 154, 103 S.Ct. at 2285.
 
 
 20
 While plaintiffs have not alleged here a DelCostello -type, hybrid Sec. 301/duty of fair representation claim, they have alleged that during the negotiation and administration of the several collective bargaining agreements, the union in concert with NYRA unfairly discriminated against them, and thereby breached the union's duty of fair representation. Due to the undeniable resemblance and substantial overlap between unfair labor practices and breaches of the duty of fair representation, see DelCostello, 462 U.S. at 169, 103 S.Ct. at 2293, we read DelCostello to require that the Sec. 10(b) six-month limitations period also be applied to unfair representation claims standing alone, see Engelhardt v. Consolidated Rail Corp., 756 F.2d 1368, 1369-70 (2d Cir.1985) (per curiam); Erkins v. United Steelworkers, 723 F.2d 837, 838 (11th Cir.), cert. denied, 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984).
 
 
 21
 A cause of action based on the duty of fair representation accrues when the union members know or reasonably should know that a breach of that duty has occurred. Santos v. District Council, 619 F.2d 963, 969 (2d Cir.1980). Thus, if plaintiffs' claims rested, as Judge Costantino seems to have assumed, solely on the activities of the union and NYRA during the negotiations for and ratification of the several agreements, such claims would have been time-barred at the latest six months after ratification of the last agreement, or by July 26, 1982. However, plaintiffs in opposing the motions to dismiss contended additionally that they are entitled to seek redress for breaches of the union's duty of fair representation on numerous occasions after the 1982 agreement took effect, and the record provides substantial support for plaintiffs' contention.
 
 
 22
 Where occurrences within the limitations period in and of themselves may constitute actionable conduct, "earlier events may be utilized to shed light on the true character of matters occurring within the limitations period". Local Lodge 1424 v. NLRB, 362 U.S. 411, 416, 80 S.Ct. 822, 826, 4 L.Ed.2d 832 (1960) (footnote omitted). Moreover, when an action involves a union's duty of fair representation, the Supreme Court advises the lower courts, as guardians of this duty, to construe complaints so as to avoid dismissals and to give plaintiffs the opportunity to file supplemental pleadings unless it appears beyond doubt that a good cause of action cannot be stated. See Czosek v. O'Mara, 397 U.S. 25, 27, 90 S.Ct. 770, 772, 25 L.Ed.2d 21 (1970) (citing Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).
 
 
 23
 The several events described above, which occurred either within the limitations period or after the filing of the complaint, in and of themselves may constitute instances in which the union breached its duty of fair representation. These events are not, as NYRA would have it, "evidentiary trivia", but if true, would have substantive significance because the union's duty to avoid "irrelevant and invidious" distinctions among the mutuel clerks it represents continued beyond ratification of its collective bargaining agreement with NYRA. See Conley v. Gibson, 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).
 
 
 24
 Collective bargaining is a continuing process. Among other things, it involves day-to-day adjustments in the contract and other working rules, resolution of new problems not covered by existing agreements, and the protection of employee rights already secured by contract. The bargaining representative can no more unfairly discriminate in carrying out these functions than it can in negotiating a collective agreement.
 
 
 25
 Id. (footnote omitted).
 
 
 26
 In view of the record before it, the district court should have given plaintiffs an opportunity to file an amended complaint, see Czosek, 397 U.S. at 27, 90 S.Ct. at 772, alleging at least the inaction of NYRA and DME regarding the contract provision relating to scheduled "offs" for Regulars, the events surrounding the mini-dealer job assignments at Saratoga, the circumstances leading to the amendment to the 1982 collective bargaining agreement affecting NYRA's ability to move New Regulars' job assignments, and the attempted settlement of the sex-discrimination suit--all post-limitations period events tending to show a breach of the union's duty of fair representation.
 
 
 27
 We have no knowledge as to whether additional, similar events have occurred since the defendants moved to dismiss the action, and therefore, we express no opinion as to the propriety of including them in an amended complaint. Nor have we considered, because at this stage it would be premature to do so, to what extent, if any, NYRA may in defense of these allegations rely on the provisions of the collective bargaining agreements which prima facie established some level of contemplated discrimination against the New Regulars.
 
 
 28
 Reversed and remanded to the district court for further proceedings.