**Joseph D. THOMAS,**
**Plaintiff–Appellant,**

v.

**UNITED PARCEL SERVICE, INC. and Local 710, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Defendants–Appellees.**

No. 88–2184.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 11, 1989.
Decided Nov. 20, 1989.

Gilbert A. Cornfield, Richard J. Tupper (argued), Gail E. Mrozowski, Cornfield & Feldman, Chicago, Ill., for plaintiff-appellant.

Steven H. Adelman (argued), Michael N. Petkovich, John A. McDonald, Keck, Mahin & Cate, Sherman Carmell, Carmell, Charone, Widmer, Mathews & Moss, Barry M. Bennett (argued), Asher, Gittler & Greenfield, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

The appellant, Joseph D. Thomas, was discharged by his employer, the United Parcel Service, Inc. ("UPS"), and filed a grievance with his union, Local 710 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local 710" or "the Union").

* Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

The appellant appeared before a Joint Grievance Committee ("JGC" or "the Committee") comprised of an equal number of union and management representatives, but the Committee, as the final arbiter of employment-related disputes, denied the appellant's petition and upheld his termination. The appellant subsequently brought suit in federal district court pursuant to § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 (1947), alleging that UPS had violated the terms of the collective bargaining agreement then in effect by discharging him from its employ without just cause and that Local 710 had breached its duty of fair representation in processing his grievance petition. The district court granted summary judgment in favor of the defendants and this appeal ensued. We now vacate the summary judgment order and remand the case to the district court.

### I.

The appellant, Joseph D. Thomas, was hired by United Parcel Service, Inc. as a tractor-trailer driver during the 1983 Christmas season and began work on a permanent basis as an on-call feeder driver in April 1984.[1] UPS requires its feeder drivers to be available for work during certain specified periods, with failure to respond to a call constituting grounds for dismissal.

On January 10, 1986, the appellant approached former UPS Feeder Division Manager Martin Heise to request a two-week vacation. Mr. Heise approved the vacation request and informed the appellant that he would be oncall beginning January 27, 1986. The appellant was ultimately unavailable for work from January 27 to January 31, 1986. In a letter dated January 31, 1986, UPS informed the appellant that future instances of unavailability could lead to his discharge from the company.

Upon receiving the January 31 UPS letter, the appellant filed a grievance with Local 710 and made a written request for UPS documents. In a meeting with Local 710 business representative Robert Falco,

the appellant also requested a copy of the rules governing JGC procedures. Mr. Falco told the appellant that he was unaware of the existence of any formal printed rules regarding JGC hearings, but forwarded the request for documents to UPS. UPS agreed to provide the documents on the day of the hearing, in accordance with UPS policy. Mr. Falco did not press the appellant's demand for documents, deferring instead to the UPS decision. Mr. Falco subsequently failed to inform the appellant of the UPS response to his request and the UPS policy with respect to documents.

At the JGC hearing, the appellant was given an opportunity to explain the reason for his unavailability from January 27–31, 1986 before the members of the Committee. The appellant maintained that he believed that he had been granted vacation *for the week of* January 27th and therefore should not have been disciplined for a legitimate misunderstanding between Mr. Heise and himself. Mr. Falco supported the appellant in his grievance request, but the JGC denied the appellant's petition.

On March 27, 1986, the appellant was issued a one-day suspension for violating a UPS rule regarding the number of consecutive hours an employee may work. The next month, on April 25, 1986, UPS left a pair of messages with the appellant's paging service, but the appellant failed to respond to either call. UPS Feeder Division Manager Dan Torrez met with the appellant concerning this latest instance of unavailability. The appellant claimed that he had not received the messages due to a malfunctioning "beeper," and that, as such, he was unwilling to accept responsibility for the incident. The appellant received a letter terminating his employment with UPS dated April 30, 1986.

The appellant filed two grievance petitions, one contesting his suspension and the other his termination, and once again appeared before the JGC. Mr. Falco argued that the one-day suspension in March should be vacated due to certain extenuating circumstances and supported the appel-

---

1. A "feeder" is a tractor-trailer transporting par- cels between UPS facilities.

lant in his termination grievance. The JGC vacated the appellant's suspension and granted the appellant back pay for the day he had been suspended. As to the discharge petition, the appellant explained why he had been unavailable and why his discharge had not been for "just cause," as required by Article 16 of the collective bargaining agreement. The Committee nevertheless upheld the UPS discharge decision and, under Article 23 of the collective bargaining agreement, the decision of the JGC constituted a final ruling on the matter.

On October 15, 1986, the appellant filed a hybrid § 301/fair representation action in federal district court, alleging that UPS had violated § 301 of the Labor Management Relations Act, 29 U.S.C. § 185,[2] by breaching the collective bargaining agreement and that Local 710 had breached its duty of fair representation in processing his grievance petition. The appellant claimed that Local 710 had cooperated with UPS in securing his discharge because of his membership in Teamsters for a Democratic Union ("TDU"), a reform group within the Union.

More specifically, the appellant alleged that, as an active and visible member of TDU, he campaigned for reform candidates running on the EAGLE slate during the 1985 election and later joined others in filing charges with the Secretary of Labor concerning the propriety of that election. During the course of discovery, the appellant learned that from August 1985 to May 1986, the JGC granted 192 of 585 grievance petitions filed by "non-dissident" union members (32.8%) and but 3 of the 19 petitions filed by dissident members (15.8%). A statistical analyst concluded that such a discrepancy reflected a less than five percent probability that chance accounted for the JGC decisions. The appellant also discovered that Mr. Falco, his representative at each of the JGC hearings, had participated in anti-TDU demonstrations and signed a leaflet opposing a TDU reform

proposal. When coupled with Mr. Falco's failure to conduct an independent investigation of the facts underlying the various grievance petitions filed by the appellant, to request documents as authorized by the collective bargaining agreement, and to inform the appellant of the rules governing JGC hearings, these acts and omissions constituted a breach of the union's duty of fair representation. As to James Dawes and John O'Connor, the two union officials sitting on the May 9, 1986 JGC, the appellant submitted evidence that Messrs. Dawes and O'Connor signed the same anti-TDU leaflet signed by Mr. Falco and that each had participated in the anti-TDU demonstrations. Furthermore, Mr. O'Connor had stated at one point that: "The union will not do a damn thing for [those] affiliated with Teamsters for a Democratic Union."

Both the Union and UPS moved for summary judgment at the close of discovery, with the Union submitting evidence that, in the case of Mr. Falco, his representation of the appellant was not atypical. Mr. Falco swore that he ordinarily does not conduct an independent investigation or challenge UPS policy regarding the presentation of documents on the day of the JGC hearing. Mr. Falco discussed the bases for the grievances with the appellant and supported his arguments before the Committee, thereby making his representation of the appellant materially indistinguishable from that offered to other grievants before the Committee, whether dissident or non-dissident. The Union also argued that the appellant failed to submit any direct evidence of bias against him by either Mr. Dawes or Mr. O'Connor and therefore failed to establish a breach of the Union's duty of fair representation.

The district court, relying on this Circuit's intentional misconduct standard enunciated in *Hoffman v. Lonza, Inc.*, 658 F.2d 519, 520 (7th Cir.1981), ruled that Mr.

**2.** Section 185 provides that:
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
 29 U.S.C. § 185(a) (1947).

Falco's effort "may show poor representation, but it does not show hostile motivation or intentional misconduct." *Thomas v. United Parcel Service, Inc.*, No. 86 C 7188, mem. op. at 4, 1988 WL 58598 (N.D.Ill. May 26, 1988). As to the statistical and other evidence of anti-TDU bias exhibited by JGC members Dawes and O'Connor, the court found it "unnecessary to consider" such evidence, *id.* at 3–4,[3] inasmuch as the "purported bias of the JGC [was] not a material fact." *Id.* at 7. Since the Union officials on the JGC did not owe union members appearing before the Committee a duty of fair representation, there could be no breach of that duty. *Id.* at 5. As a result, the district court granted the defendants' motions for summary judgment and entered judgment in favor of the defendants on May 26, 1988. The appellant filed a timely notice of appeal on June 23, 1988 and this appeal ensued. We have jurisdiction pursuant to § 301(a) of the LMRA, 29 U.S.C. § 185(a), and 28 U.S.C. § 1291.

## II.

"Our review of a grant of summary judgment involves a two-step process in which we first determine whether there are any genuine issues as to any material facts and then, if no issues of material fact exist, we decide whether summary judgment is correct as a matter of law." *Johnson v. Artim Transportation System, Inc.*, 826 F.2d 538, 546 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988). *See also Schlifke v. Seafirst Corp.*, 866 F.2d 935, 937 (7th Cir.1989); Fed.R.Civ.P. 56(c) (summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law"). The Supreme Court has expounded upon Federal Rule of Civil Procedure 56(c) as follows: "Where the record taken as a whole could not lead a rational

trier of fact to find for the nonmoving party, there is 'no genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). We must undertake a *de novo* review of the record, *Central States, S.E. & S.W. Areas Pension Fund v. Jordan*, 873 F.2d 149, 152 (7th Cir.1989), and draw all reasonable inferences from the record in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Schlifke*, 866 F.2d at 937; *Rodeo v. Gillman*, 787 F.2d 1175, 1177 (7th Cir. 1986).

## III.

The § 301/fair representation action filed by the appellant is frequently referred to as a "hybrid" suit, *see, e.g., Reed v. United Transportation Union*, — U.S. —, 109 S.Ct. 621, 627, 102 L.Ed.2d 665, 677 (1989); *Johnson*, 826 F.2d at 541 n. 1; *Flores v. Levy Co.*, 757 F.2d 806, 808 (7th Cir.1985), and, as the Supreme Court has only recently observed, "[s]uch hybrid suits formally comprise two causes of action." *Reed*, — U.S. at —, 109 S.Ct. at 627, 102 L.Ed.2d at 677. The *Reed* Court continued:

First, the employee alleges that the employer violated § 301 of the Labor Management Relations Act, 1947 (LMRA), 61 Stat. 156, 29 U.S.C. § 185, by breaching the collective-bargaining agreement. Second, the employee claims that the union breached its duty of fair representation, which this Court has implied from the scheme of the NLRA, by mishandling the ensuing grievance-and-arbitration proceedings.

*Id. See also DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 164–65, 103 S.Ct. 2281, 2290–91, 76 L.Ed.2d

---

**3.** The district court did rule that the Affidavit of Vernon Nelson was inadmissible under Fed.R.

Evid. 801(d)(2)(D). *Thomas,* mem. op. at 5–7.

476 (1983); *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 570–71, 96 S.Ct. 1048, 1059–60, 47 L.Ed.2d 231 (1976); *Niro v. Fearn International, Inc.,* 827 F.2d 173, 178 (7th Cir.1987).

Although the § 301 claim against the employer precedes the fair representation claim temporally, *i.e.,* the alleged breach of the collective bargaining agreement by the employer arises prior to the alleged breach of the duty of fair representation by the union, the employee must first establish a breach by the union before a court will entertain evidence against the employer. *See United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 62, 101 S.Ct. 1559, 1563, 67 L.Ed.2d 732 (1981); *Adams v. Budd Co.,* 846 F.2d 428, 431–32 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989); *Superczynski v. P.T.O. Services, Inc.,* 706 F.2d 200, 203–04 (7th Cir.1983). That is, unless the employee can establish that the integrity of the grievance process was subverted by the union, the courts will not displace the decision reached by the arbitral body created by the collective bargaining agreement. *See Hines,* 424 U.S. at 570–71, 96 S.Ct. at 1059–60; *Vaca v. Sipes,* 386 U.S. 171, 186, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967); *Flores,* 757 F.2d at 808; *Huffman v. Westinghouse Electric Corp.,* 752 F.2d 1221, 1223 (7th Cir.1985).

The courts have adopted an unwaivering attitude of deference to arbitral decisions, *see, e.g., W.R. Grace & Co. v. Rubber Workers,* 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983); *Hines,* 424 U.S. at 562, 96 S.Ct. at 1055; *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation,* 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 566, 80 S.Ct. 1343, 1345, 4 L.Ed.2d 1403 (1960); *Jones Dairy Farm v. Local No. P–1236, United Food & Commercial Workers International Union,* 760 F.2d 173, 176 (7th Cir.), *cert. denied,* 474 U.S. 845, 106 S.Ct. 136, 88 L.Ed.2d 112 (1985); *Freeman v. Local Union No. 135, Chauffeurs, Teamsters, Warehousemen & Helpers,* 746 F.2d 1316, 1319 (7th Cir.1984), particularly in the labor context, because of the federal labor policy encouraging the private settlement of labor disputes. *See, e.g., Reed,* —— U.S. at ——, 109 S.Ct. at 628, 102 L.Ed.2d at 677; *DelCostello,* 462 U.S. at 162, 103 S.Ct. at 2289; *Bowen v. United States Postal Service,* 459 U.S. 212, 225, 103 S.Ct. 588, 596, 74 L.Ed.2d 402 (1983); *Hines,* 424 U.S. at 571, 96 S.Ct. at 1059; *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964); *American Mfg. Co.,* 363 U.S. at 566, 80 S.Ct. at 1345; *Niro,* 827 F.2d at 176; 29 U.S.C. § 173(d). Behind this deferential stance is a belief that "the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government," *Warrior & Gulf,* 363 U.S. at 581, 80 S.Ct. at 1352, with "[t]he refusal of courts to review the merits of an arbitration award … the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Enterprise Wheel,* 363 U.S. at 596, 80 S.Ct. at 1360. *See also American Mfg. Co.,* 363 U.S. at 566, 80 S.Ct. at 1345 (Congressional policy can be "effectuated only if the means chosen by the parties for settlement of their dffferences under a collective bargaining agreement is given full play"). As a result, arbitral decisions are final unless the employee can establish that the union "seriously undermine[d] the integrity of the arbitral process" by breaching its duty of fair representation. *Hines,* 424 U.S. at 567, 96 S.Ct. at 1058.

The § 301 and fair representation causes of action are therefore "inextricably interdependent," *DelCostello,* 462 U.S. at 164–65, 103 S.Ct. at 2290–91; *Niro,* 827 F.2d at 178, with the fair representation claim serving as the "indispensable predicate," *Mitchell,* 451 U.S. at 62, 101 S.Ct. at 1564, and a "condition precedent" to the § 301 suit against the employer. *Adams,* 846 F.2d at 431–32. *See also Hines,* 424 U.S. at 570–

71, 96 S.Ct. at 1059–60; *Vaca*, 386 U.S. at 186, 87 S.Ct. at 915; *Flores*, 757 F.2d at 808; *Huffman*, 752 F.2d at 1223; *Superczynski*, 706 F.2d at 203–04; *Rupe v. Spector Freight Systems, Inc.*, 679 F.2d 685, 691 (7th Cir.1982). Thus, in ruling upon the instant appeal, we must first examine the fair representation claim against Local 710.

It is axiomatic that the union enjoys broad authority in its role as the exclusive bargaining agent for a class of employees, *see, e.g., DelCostello*, 462 U.S. at 164 n. 14, 103 S.Ct. at 2290 n. 14; *Bowen*, 459 U.S. at 226, 103 S.Ct. at 596; *Hines*, 424 U.S. at 564, 96 S.Ct. at 1056; *Humphrey v. Moore*, 375 U.S. 335, 342, 84 S.Ct. 363, 367, 11 L.Ed.2d 370 (1964); *Ford Motor Co. v. Huffman*, 345 U.S. 330, 336, 73 S.Ct. 681, 685, 97 L.Ed. 1048 (1953), and therefore owes a concommitant duty of fair representation to each of its members. *See DelCostello*, 462 U.S. at 164 n. 14, 103 S.Ct. at 2290 n. 14; *Bowen*, 459 U.S. at 226, 103 S.Ct. at 596; *Vaca*, 386 U.S. at 177, 87 S.Ct. at 910; *Humphrey*, 375 U.S. at 342, 84 S.Ct. at 367; *Ford Motor Co.*, 345 U.S. at 337, 73 S.Ct. at 685; *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); *Tongay v. Kroger Co.*, 860 F.2d 298, 300 (8th Cir. 1988); *Grant v. Burlington Industries*, 832 F.2d 76, 79 (7th Cir.1987); *Hoffman v. Lonza, Inc.*, 658 F.2d at 522. "The undoubted broad authority of the union as the exclusive bargaining agent in the negotiation and administration of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation." *Humphrey*, 375 U.S. at 342, 84 S.Ct. at 368. "That duty [of fair representation] was implied by the Court because members of bargaining units were forced to accept unions as their exclusive bargaining agents. Because employees had no administrative remedy for a breach of that duty, we recognized a judicial cause of action on behalf of the employees." *Karahalios v. National Federation of Federal Employees, Local 1263*, —— U.S. ——, 109 S.Ct. 1282, 1287, 103 L.Ed.2d 539 (1989). *See also Niro*, 827 F.2d at 178; *Frandsen v. Broth-*

*erhood of Railway, Airline & Steamship Clerks*, 782 F.2d 674, 678 (7th Cir.1986); *United Independent Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1274, 1281 (7th Cir.1985). "Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes the statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca*, 386 U.S. at 177, 87 S.Ct. at 910. *See also Ford Motor Co.*, 345 U.S. at 337, 73 S.Ct. at 365.

Inasmuch as Local 710 is the exclusive bargaining agent for the unit in question, it follows that Local 710 owes the appellant, as a member of that unit, a duty of fair representation. Before we analyze the sort of conduct that would constitute a breach of the duty of fair representation, we must first define the duty itself.

As the preceding statements indicate, the Court has commonly spoken of a union's duty to represent its members fairly in broad, rather undifferentiated terms. C. Morris, 2 *The Developing Labor Law* 1321 (2d ed. 1983) (neither the courts nor the NLRB have "articulated clear distinctions defining the duty in relation to the particular aspect of union representation which is being challenged"). We do not believe that the duty of fair representation is quite so monolithic, however, with "fair representation" assuming different meanings in different contexts. As the Eleventh Circuit has recently recognized, "[t]he nature of the duty of fair representation which a Union owes its members is determined by considering the context in which the duty is asserted." *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1519 (11th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989). As such, a number of distinctions must be made in order to achieve the flexibility necessary to realize justice in this area of the law.

We begin by noting that the courts have ordinarily, almost reflexively, deferred to union judgments, regardless of the circumstances. Our deferential stance is prem-

ised upon the belief that unions must be permitted to exercise a fair degree of discretion in making the policy choices necessary to secure the good of their members. *See Hines,* 424 U.S. at 563, 96 S.Ct. at 1055; *Humphrey,* 375 U.S. at 349–50, 84 S.Ct. at 371–72 (the union is "given great latitude to compromise competing interests among its members"); *Ford Motor Co.,* 345 U.S. at 338, 73 S.Ct. at 686; *Steele,* 323 U.S. at 202, 65 S.Ct. at 232; *Masy v. New Jersey Transit Rail Operations, Inc.,* 790 F.2d 322, 328 (3d Cir.), *cert. denied,* 479 U.S. 916, 107 S.Ct. 320, 93 L.Ed.2d 293 (1986). The union does not, however, exercise the same degree of discretion in each of its functions. As the Supreme Court has recognized in the negotiation context:

> Any authority to negotiate derives its principal strength from a delegation to the negotiators of a discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented.
>
> \* \* \* \* \* \*
>
> The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty in the exercise of its discretion.

*Ford Motor Co.,* 345 U.S. at 337–38, 73 S.Ct. at 685–86.

■ In any group of even moderate size and diversity, there are bound to be competing claims of entitlement, as well as conflicting opinions as to how best to achieve the common good of the group. *Humphrey,* 375 U.S. at 349–50, 84 S.Ct. at 371–72 (" [c]onflict between employees represented by the same union is a recurring fact"); *Steele,* 323 U.S. at 203, 65 S.Ct. at 232; Bates, *Benefits of Retirees: Negotiation and the Duty of Fair Representation,* 21 J. Marshall L.Rev. 513, 513 (1988) (unions strive to "equitably distribute to diverse memberships, with internally conflicting priorities, the remaining pieces of an ever shrinking pie"). For example, un-

ions must frequently attempt to strike the right balance between such immediately recognizable benefits as an increase in wages and more remote goods, such as retirement benefits or seniority protection for their workers. *See Humphrey,* 375 U.S. at 335, 84 S.Ct. at 363; *Sutton v. Weirton Steel Division of National Steel Corp.,* 724 F.2d 406, 412 (4th Cir.1983), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984) (" [i]t is inevitable in the give-and-take of collective bargaining that some employees will fare worse than others"). In addition, each union member has a variety of needs beyond merely income and wages, including health, pension, unemployment, training, and safety plans. *Hines,* 424 U.S. at 563, 96 S.Ct. at 1055; *Humphrey,* 375 U.S. at 343, 84 S.Ct. at 368; Harper & Lupu, *Fair Representation and Equal Protection,* 98 Harv.L.Rev. 1212, 1260 (1985) (" [d]istributive judgments must be made because it is a central function of ... exclusive bargaining representatives ... to mediate the problems of allocating finite resources") [hereinafter *Fair Representation* ]. Our refusal to closely scrutinize the choices made by unions in the negotiation context is an acknowledgement of the complexity of the task presented, the range of more or less reasonable options available, and the authority of unions to act as autonomous agents on behalf of their members.

■ These reasons carry their greatest force when the union is negotiating a collective bargaining agreement on behalf of its members. It is at that time that our rule of deference is most compelling, for it is during the negotiation of a collective bargaining agreement that the union is required to safeguard and promote the good of its members *in the aggregate.* The union is most clearly serving as the representative of its members in the negotiation of such an agreement. Indeed, the very word "represent" is defined as:

> to supply the place, perform the duties, exercise the rights, or receive the share of: to take the place of in some respect: fill the place of for some purpose: substitute in some capacity, act the part of, in

the place of, or for (as another person) usually by legal right.

Webster's Third New International Dictionary 1926 (3d ed. 1981).

■ Once the union is called upon to *administer* a collective bargaining agreement, it assumes a more ministerial role and is therefore entitled to less deference than it enjoyed in the negotiation of the agreement. Once an agreement has been reached, the critical value and policy choices have been made and the range of alternatives narrowed accordingly. It is less intrusive, and less an affront to union dignity, for a court to examine whether the union has complied with an agreement *it entered voluntarily* than for that same court to assess the wisdom of the agreement itself. As a result, a handful of courts have applied a bifurcated standard to fair representation suits. *See, e.g., Parker*, 855 F.2d at 1519–20; *Swatts v. United Steelworkers of America*, 808 F.2d 1221, 1224 (7th Cir.1986); *Eatz v. DME Unit of Local Union Number 3*, 794 F.2d 29, 34 (2d Cir.1986); *Schultz v. Owens–Illinois, Inc.*, 696 F.2d 505, 514–15 (7th Cir.1982). *See also* Leffler, *Piercing the Duty of Fair Representation: The Dichotomy Between Negotiations and Grievance Handling*, 1979 U.Ill.L.F. 35.

In the lead case of *Schultz v. Owens–Illinois, Inc.*, 696 F.2d 505 (7th Cir.1982), this Court declared that "[d]uty of fair representation cases may take two forms:" those claiming a breach in the negotiation of a collective bargaining agreement and those alleging a breach in the administration of such an agreement. *Id.* at 514. The *Schultz* Court correctly viewed *Ford Motor Co.*, 345 U.S. at 330, 73 S.Ct. at 681, as articulating the standard in the negotiation context, with the union afforded a "wide range of reasonableness ... in serving the unit it represents...." *Id.* at 338, 73 S.Ct. at 686. *See also Parker*, 855 F.2d at 1520 (union breaches its duty in negotiation of agreement if conduct is "arbitrary, irrational, or undertaken in bad faith"). "On the other hand, when assessing a union's conduct in processing a grievance, the Supreme Court, while also using a 'good

faith' standard, has not purported to grant the union 'a wide range of reasonableness.'" *Schultz*, 696 F.2d at 515. In the administration of a collective bargaining agreement, *Vaca v. Sipes*, 386 U.S. at 171, 87 S.Ct. at 903, sets the standard, and, in this context:

[T]he Court did not ... focus on the inherent difficulties of satisfying the demands of diverse employees as it had in [*Ford Motor Co.*]. Instead, the Court emphasized the union's statutory obligation to represent each individual employee fairly, with a nonperfunctory concern for his complaints and with a nonarbitrary exercise of judgment in evaluating grievances. The application of the *Vaca* standard in the context of grievance procedures does not provide for union discretion within 'a wide range of reasonableness'—in contrast to the collective bargaining standard of [*Ford Motor Co.*].

*Schultz*, 696 F.2d at 515.

That is not to say that the union administering a collective bargaining agreement is wholly lacking in discretion or subject to searching review by the courts. As Professors Harper and Lupu have observed:

Like all contracts, the distributional agreements between employers and unions that emerge from collective bargaining negotiations require interpretation and elaboration. The need to resolve ambiguities in wording, to fill interstices of the agreement, and to adjust contract provisions to unforeseen developments is especially great for collective labor agreements because they purport to establish comprehensive governing codes for multifaceted employment relationships.

*Fair Representation*, 98 Harv.L.Rev. at 1260.

■ The distinction we have made between the negotiatory and administrative stages of the collective bargaining process does not mean that the courts will undertake a *de novo* review of union decisions in the administration of collective bargaining agreements, but only that less deference will be accorded unions serving in that

capacity than in the negotiation of such agreements.

Having distinguished between the union *qua* negotiator and the union *qua* administrator, we believe further distinctions are in order. Within its role as administrator of the collective bargaining agreement, the union engages in a number of materially different activities. While it would be neither useful nor practicable to compile an exhaustive list of union activities categorized as essentially administrative, the contrast between the interpretation of a collective bargaining agreement and the processing of a grievance—both administrative functions—is illustrative. The deference afforded the union in interpreting the collective bargaining agreement would be misplaced in the processing of a grievance, for the union exercises less discretion in the grievance process. As party to the collective bargaining agreement, the union is in a privileged position to discern the meaning of the agreement and, more importantly, must protect the rights of its members as a group. In the processing of a grievance, on the other hand, the union enjoys no such privileged status and has both a more restricted range of options and a more particularized set of obligations. Once again, our rule of deference to union decisions is progressively less compelling as the purposes for the rule are weakened and the identity of interests between the union and the individual member become more apparent. As the interests of the union and a specific member coalesce, union conduct that does not benefit that member is more difficult to justify.

Just as one may distinguish between the union's role as negotiator from its role as administrator, and then again between its role as interpreter of the agreement from that of processor of a grievance in the administering of a collective bargaining agreement, so too the union frequently serves a number of functions within the grievance process itself. In the instant case, we can discern at least two such roles: (i) as the representative of the grievant before the JGC; and (ii) as a member of the JGC. In assisting a grievant appearing before the JGC, the union functions in a manner not wholly unlike that of an attorney representing a client in court. *See, e.g., Dober v. Roadway Express, Inc.*, 707 F.2d 292, 294 (7th Cir.1983); *Graf v. Elgin, Joliet and Eastern Railway Co.*, 697 F.2d 771, 779 (7th Cir.1983). The union official handling the grievance will typically meet with the grievant, discuss the grievant's petition, suggest possible arguments, and perhaps conduct an investigation of the underlying facts. Throughout the grievance process, the union representative has but one loyalty—to promote the good of the individual member. The union need not, and may not, sacrifice the rights of the individual to what it deems to be in the interests of the union as a whole, as it often must do during contract negotiation. No longer is the union forced to accommodate the multiple and oftentimes conflicting demands of an entire group of employees; instead, it is presented with but a single member with a concrete and limited need. In such a situation, the duty of fair representation requires the union to assist the grievant in securing the materials necessary for a fair hearing before the committee, putting forward the strongest arguments one could reasonably make on the grievant's behalf, and, when warranted, conducting a meaningful investigation of the underlying facts giving rise to the petition. *See Ames v. Westinghouse Electric Corp.*, 864 F.2d 289, 293 (3d Cir.1988) ("Among those duties is the fair and prompt consideration and, if dictated by controlling legal standards, processing on behalf of employees of their claims under contract dispute resolution procedures"); *Rupe*, 679 F.2d at 694; *Miller v. Gateway Transportation Co.*, 616 F.2d 272, 277 (7th Cir.1980); *Baldini v. Local 1095*, 581 F.2d 145, 152 (7th Cir.1978).

The duty of fair representation does *not* require the union to prosecute frivolous grievances to the full extent possible under the collective bargaining agreement, for it is well-established that a union need not process a grievance through arbitration. *See Hines*, 424 U.S. at 567, 96

920

S.Ct. at 1057; *Vaca,* 386 U.S. at 192, 87 S.Ct. 918 ("a union does not breach its duty of fair representation.... merely because it settled the grievance short of arbitration"); *Humphrey,* 375 U.S. at 349, 84 S.Ct. at 371 ("a union must be free to sift out wholly frivolous grievances"); *Freeman,* 746 F.2d at 1322. We understand this principle to allow the union an independent judgment as to the merits of each petition, but not to dilute the union's duty to represent its members fairly. The standard of assistance set forth in this decision in no way impinges upon the ability of the union to exercise an independent judgment, but simply requires the union to provide as much assistance in the processing of a grievance as the merits of the grievance demand. *See Graf,* 697 F.2d at 779.

Neither do we wish to impose a strict standard of competency on the union official processing grievances. Although the union official serves as advocate for and counselor to the grievant, it is unreasonable to expect union officials to meet the same standards expected of an attorney in a court of law. We have no doubt that certain acts or omissions by a union official representing a grievant, while actionable if done by an attorney, would not constitute a breach of the union duty of fair representation. As this Court has noted, it would be "unrealistic" to impose a "judicially devised standard of competent representation" on union officials. *Dober,* 707 F.2d at 294–95. *See also Graf,* 697 F.2d at 779. We therefore stop short of defining the standard of representation required of a union official serving in such a capacity.

 Union officials serving on a JGC are, we submit, functioning in a fundamentally different capacity. Presumably, the purpose of such committees is to review

the initial decision giving rise to the grievance and render a fair decision: either affirming or reversing the earlier decision as justice requires. If the union or management representatives on JGCs were merely partisans for their respective group, deadlock and arbitration would be the inevitable result. Under such a system, the JGC would become a mere procedural way station, screening only those grievances in which either the union or management representative failed to discharge his or her "duty" and send the grievance to an arbitrator. If that is truly what the parties to the collective bargaining agreement intended, the usefulness of the JGC must be called into question. Surely the fact that the collective bargaining agreement establishes a JGC and posits final decision-making authority in that body reflects an understanding that the JGC is to serve more than a merely nominal purpose. As the Supreme Court has stated, "[i]n providing for a grievance and arbitration procedure which gives the union discretion to invoke arbitration, the employer and the union contemplate that each will endeavor in good faith to settle grievances short of arbitration." *Vaca,* 386 U.S. at 191, 87 S.Ct. 917. It is more reasonable to assume that the JGC is to serve a meaningful purpose as an adjudicator of employment-related disputes, thereby requiring Committee members to exercise a fair and independent judgment on each petition presented to the Committee.[4] Unlike the union representative assisting the grievant in preparing his petition and arguments, the union official sitting on the JGC does not have the interests of a single member at heart. The union has determined that such committees are beneficial to its members and has agreed to settle grievances according to the

4. We are not unmindful of the differences in perspective that exist between union and management representatives, differences that will make wholly impartial and value-neutral decisions impossible. Despite the best efforts of each side, JGC members cannot assume identities other than their own and these differences will surely result in conflicting conclusions as to what should be done with respect to at least some grievances. While we recognize, even to the point of endorsing, such diversity, we are

not so cynical as to believe, as the appellant suggests, that management representatives will systematically and unreflectively vote to deny grievance petitions. Splits will occur and grievances will then be forwarded to an arbitrator, but if either management or labor routinely engages in bad faith performance on a JGC, the other party will most assuredly refuse to enter such a process when negotiating the next collective bargaining agreement.

procedures outlined in the collective bargaining agreement. The union official serving on a JGC discharges his responsibility to union members by *not* serving as an advocate for the grievant. As the Eighth Circuit has observed, the "[m]embers of these [grievance] committees essentially function as arbitrators on an adjudicatory body, and, consequently, they owe no 'duty of partiality' to either the employer or the employee." *Tongay v. Kroger Co.*, 860 F.2d at 300 (quoting *Early v. Eastern Transfer*, 699 F.2d 552, 560 (1st Cir.1983). *Accord Grant*, 832 F.2d at 80. Similarly, in *Beckett v. Anchor Motor Freight*, 113 L.R.R.M. 2608, 1982 WL 2036 (S.D.Ohio 1982), the district court rejected the plaintiffs-employees' argument that the union representatives on the committee were "obligated to deadlock their grievances to independent arbitration" and ruled instead that "[u]nion members of an arbitration panel are acting, not as representatives of the grievant, but as neutral decision-makers." *Id.* at 2613.

If, then, members of the JGC are not mere partisans but quasi-arbitral adjudicators, what sort of duty, if any, do union officials owe members appearing before the JGC? If we prescind from the use of labels for a moment, it is helpful to note that both the appellant and the Union agree that union officials on the JGC owe a duty of impartiality to grievants. The appellant describes such a duty as one of fair representation, but concedes that union officials cannot be required to perform their duties on JGCs as unblinking partisans—therefore conceding that a duty of partiality is inappropriate. The Union characterizes the union duty as the general arbitral duty of fairness and impartiality.

 On its face, there is much to recommend the analysis suggested by the Union. To equate the duty of impartiality with the duty of fair representation has certain obvious and unfortunate implications, for "representation," by its very definition, connotes a concept at odds with that of impartiality. The union official assisting the grievant in preparing his petition clearly owes the union member a duty of fair *representation*, for he is, broadly speaking, serving in the role of advocate and counselor; the union official serving on a JGC clearly owes the grievant a duty of *impartiality* and fairness, for he is serving in a role similar to that of an arbitrator or judge. The question quickly becomes whether the union official serving on a JGC owes the grievant a duty *beyond* that of impartiality and fairness. A number of courts have refused to impose a duty of fair representation on union officials serving on JGCs because such a duty would presumably undermine the purpose of the JGC. *See Tongay*, 860 F.2d at 300; *Grant*, 832 F.2d at 80; *Early*, 699 F.2d at 560; *Beckett*, 113 L.R.R.M. at 2613. We too are unable to imagine a duty greater than that of impartiality and fairness but less than one of partisanship—particularly one consistent with the essential function of a JGC. Thus, committee members are precluded from drawing upon irrelevant and prejudicial criteria or information in deciding grievance petitions. Although JGC decisions might well have been effectively shielded from judicial review in the past by a misplaced deference to union judgments and private settlement procedures, we are convinced that a duty of impartiality and fairness will not permit JGC members to rely upon political, religious, racial, ethnic, personal, or otherwise impermissible factors when ruling upon a grievance petition.

To simply hold that a union official sitting on a JGC does not owe a grievant a duty of fair representation is too facile a conclusion, however, for, as the district court correctly observed, if the union representatives on the JGC do not owe the grievant a duty of fair representation, there can be no breach of that duty. *Thomas,* mem. op. at 5. We have ruled that members of a JGC, whether they be union or management officials, must be impartial and fair in ruling upon grievance petitions, but we have expressly refrained from characterizing this duty as an arbitral duty, for without a breach of the union's duty of *fair representation* there can be no recovery under § 301 of the LMRA. The Court has implied the duty of fair representation

from the structure of the LMRA, *see, e.g.*, *DelCostello*, 462 U.S. at 164, 103 S.Ct. at 2290; *Vaca*, 386 U.S. at 177, 87 S.Ct. at 910; *Humphrey*, 375 U.S. at 342, 84 S.Ct. at 368; *Ford Motor Co.*, 345 U.S. at 337, 73 S.Ct. at 685, and made a breach of that duty the "indispensable predicate," *Mitchell*, 451 U.S. at 62, 101 S.Ct. at 1563, for an action under § 301. *See also Adams*, 846 F.2d at 431–32; *Rupe*, 679 F.2d at 691. If we did *not* impose the duty of fair representation on union officials sitting on JGCs, we would effectively read § 301 out of existence in the grievance context. No matter how intentional, discriminatory, or harmful the union conduct, so long as the misconduct took place while the union official was serving on JGC, the union could only be held liable for breaching its arbitral duty of impartiality—the breach of which would not allow a grievant to maintain a § 301 action against the employer under existing law.

 If we are correct, however, in viewing the duty of fair representation as a flexible duty, varying as the union function varies, then it is entirely consistent with the foregoing analysis to hold that the union owes its members a duty of fair representation while serving *in each of its many roles*. The content of the duty in a particular context is derived by examining the particular union function—its degree of discretion, the number of interests it must represent, and so on—and determining what fair representation would consist of, given that function. To wit, the union is afforded great deference in the negotiation context, as it must exercise broad discretion to accommodate a variety of interests in order to represent its members ade-

quately, less deference in the administrative context, in which its degree of discretion is more limited, and still less in the processing of grievances, where the number of interests it must represent has narrowed. The nature of the union's role in assisting grievants appearing before a JGC is essentially that of an advocate and the duty of fair representation is defined by the reasonable discharge of an advocate's duty; the nature of the union's role in sitting on a JGC is essentially that of an arbitrator and the union fulfills its duty of fair representation by rendering a fair and impartial decision on the merits.

Having determined that the content of the duty of fair representation is to be measured by the nature of the challenged union activity is not to have defined the burden the employee must meet in establishing a breach of the duty of fair representation.

In order to establish that a union breached its duty of fair representation, the employee must show that the union conduct was "arbitrary, discriminatory, or in bad faith," *Vaca*, 386 U.S. at 190, 87 S.Ct. at 916, for "mere errors in judgment" are insufficient. *Hines*, 424 U.S. at 567, 96 S.Ct. at 1058. Furthermore, we will not displace the JGC ruling unless the breach "seriously undermines the integrity of the arbitral process...." *Id. See also Mitchell*, 451 U.S. at 61, 101 S.Ct. at 1563.

 In this Circuit, the prevailing standard requires the employee to prove that the union conduct was "intentional, invidious, and directed at the employee...." *Hoffman*, 658 F.2d at 520.[5] In *Hoffman*,

---

5. Ours is the only circuit to require proof of intentional misconduct. All other appellate courts have ruled that, while mere negligence is insufficient to constitute a breach, the perfunctory processing of a grievance may rise to the level of a breach of the duty of fair representation. *See Shane v. Greyhound Lines, Inc.*, 868 F.2d 1057, 1061 (9th Cir.1989); *Deringer v. Columbia Transportation Division, Oglebay Norton Co.*, 866 F.2d 859, 864 (6th Cir.1989); *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1520 (11th Cir.1988); *Dement v. Richmond, Fredericksburg & Potomac Railroad Co.*, 845 F.2d 451, 459–60 (4th Cir.1988); *Masy v. New Jersey Transit Rail Operations, Inc.*, 790 F.2d 322, 328 (3d Cir.1986);

*Hammons v. Adams*, 783 F.2d 597, 601 (5th Cir.1986); *NLRB v. Local 282, International Brotherhood of Teamsters*, 740 F.2d 141, 147 (2d Cir.1984); *Curtis v. United Transportation Union*, 700 F.2d 457, 458 (8th Cir.1983); *Warehouse Union, Local 860, International Brotherhood of Teamsters v. NLRB*, 652 F.2d 1022, 1025 (D.C.Cir.1981); *Foust v. International Brotherhood of Electrical Workers*, 572 F.2d 710, 715 (10th Cir.1978), *modified*, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979); *DeArroyo v. Sindicato de Trabajadores Packinghouse*, 425 F.2d 281, 284 (1st Cir.1970), *cert. denied*, 400 U.S. 877, 91 S.Ct. 121, 27 L.Ed.2d 115 (1970). These

the union failed to file a timely appeal, thereby preventing the grievant from obtaining a review of the initial ruling. *Id.* at 519. This Court ruled that the union " 'duty' is not breached and the employee has no remedy without substantial evidence of fraud, deceitful actions or dishonest conduct." *Id.* at 522. Inasmuch as the employee was unable to meet this burden, the Court affirmed the entry of summary judgment by the district court. *Id.* at 523.

The *Hoffman* standard is applicable to this case, for the instant appellant alleges intentional misconduct by Local 710 in the processing of his grievance. Given the fact that the appellant has alleged that the Union breached its duty of fair representation by intentionally undermining his grievances based on his political allegiances within the Union, the district court's refusal even to consider the evidence submitted by the appellant was misguided. It is well-established that "the use of forbidden grounds of decision ... creates a legitimate claim of 'unfair' representation." *Antrim v. Burlington Northern, Inc.,* 847 F.2d 375, 378 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 226, 102 L.Ed.2d 216 (1988). Among these "forbidden grounds of decision" are the "employee's position on the union and its leaders," *Adams,* 846 F.2d at 433, and when "a union deliberately refuses to process a possibly meritorious grievance for an improper reason, such as that the assigned worker is not a union supporter or adheres to some minority faction of the union...." *Dober,* 707 F.2d at 295.

In *Grant v. Burlington Industries,* 832 F.2d at 76, the employee was "an openly active leader of Teamsters for a Democratic Union" and opposed Local 710 as his union representative. *Id.* at 77. The employee's grievance petition was denied by the JGC, and he subsequently brought suit against the union for failure to represent him fairly before the Committee. *Id.* at 78. Although we found no evidence that the employee had been represented in a manner inferior to other grievants or that differences between the union and the employee were the motivating factors resulting in the denial of his petition, we made clear that discrimination based on the employee's dissident status would constitute a breach of the duty of fair representation. *Id.* at 80. *See also Mangiaguerra v. D & L Transport, Inc.,* 410 F.Supp. 1022, 1023–24 (N.D.Ill.1976).

Our prior decisions make it clear that union conduct motivated out of a distaste for the member's political views may constitute a breach of the duty of fair representation. *See, e.g., Antrim,* 847 F.2d at 378; *Adams,* 846 F.2d at 433; *Grant,* 832 F.2d at 80; *Steffens v. Brotherhood of Railway, Airline & Steamship Clerks,* 797 F.2d 442, 445 (7th Cir.1986); *Camacho v. Ritz–Carlton Water Tower,* 786 F.2d 242, 244 (7th Cir.), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986). As such, the district court erred in refusing to consider evidence of union bias in ruling upon the motions for summary judgment. The district court was quite correct, however, in inferring that this Court has not heretofore imposed the standard duty of fair representation on union officials serving on JGCs and that, absent such a duty, there could be no breach. We now remedy this gap in our fair representation jurisprudence by declaring that union officials sitting as JGCs owe grievants a duty of fair representation, and that the duty of fair representation, *in that context,* consists in an obligation to render fair and impartial decisions on the merits. Inasmuch as the § 301 action against UPS is dependent upon the fair representation suit against

---

appellate decisions appear to be in line with the guidance provided by the Supreme Court in *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) when it declared that "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion...." *Id.* at 191, 87 S.Ct. at 917. Later Supreme Court decisions have utilized the same language in addressing the duty of a union to represent its members fairly. *See, e.g., DelCos-*

*tello v. International Brotherhood of Teamsters,* 462 U.S. 151, 164, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983); *Bowen v. United States Postal Service,* 459 U.S. 212, 221, 103 S.Ct. 588, 594, 74 L.Ed.2d 402 (1983); *International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 47, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979); *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 568–69, 96 S.Ct. 1048, 1058–59, 47 L.Ed.2d 231 (1976).

924

Local 710, we VACATE the district court order granting summary judgment in favor of the defendants and REMAND the case to the district court for further proceedings not inconsistent with this decision.[6]

BAUER, Chief Judge, concurring.

I concur. I am happy to join Judge Grant's position on the duty of fair representation as applied to members of the Joint Grievance Committee; all anyone can ask of a judicial tribunal, by whatever name or however it comes into being, is that the various members render fair and impartial decisions on the merits. This is "fair representation." The standard is both easy to understand and, in the context of the situation in which it is, and will be, applied, complete.

I write principally to comment on footnote 5 of the opinion, which addresses the requirement in this circuit of intentional misconduct. That issue has been raised repeatedly in cases before this circuit and remains rather firmly in place. In fact, the standard has been upheld by this circuit in 19 cases since 1981, with a variety of members of this court serving on the various panels. If it is unique to this circuit, that fact does not seem to have caused any consternation to the court as an institution.

---

6. We note in conclusion that counsel for Local 710 submitted no less than three letters directing our attention to additional authority within the space of three weeks following oral argument. While citation to additional authority is frequently helpful and certainly permitted under Circuit Rule 28(i), it is nevertheless irksome for the Court to receive weekly updates from the parties. Such addenda are particularly inappropriate when, as in this case, nine of the ten decisions cited were handed down from 1982–1987 and could have been discovered in time to be included in the Union's brief. The appellate brief is the appropriate vehicle for counsel to make his arguments and cite relevant decisions. It is unfair to the Court and opposing counsel to be forced to consider the implications of additional authority after oral argument. In the future, we suggest that counsel complete his research prior to oral argument.