Kevin L. MARTIN, Richard M. Goodwin, John Hutchinson, Charles Kohler, Kenneth Kruhaj, Bill E. Nordyke, Richard Nusbaum, Harold S. Sancya, Joseph J. Shingle, Jerome G. Tucker, and Donald D. Briney, Plaintiffs–Appellants,

v.

YOUNGSTOWN SHEET & TUBE COMPANY, Jones & Laughlin Steel, Incorporated, LTV Steel Company, United Steelworkers of America Local Union 1011, Loren D. Hanson, Phil Krivickas, Dennis Henry, Warren F. Koonce, Henry Rowsey, and Louis A. Crane, Defendants–Appellees.

No. 86–1287.

United States Court of Appeals, Seventh Circuit.

Argued May 29, 1990.

Decided Aug. 10, 1990.

Michael L. Muenich, Hand, Muenich & Wilk, Highland, Ind., for Kevin L. Martin.

Lawrence L. Summers, Vedder, Price, Kaufman & Kammholz, William H. Schmelling, Chicago, Ill., Angelo A. Buoscio, Whitted & Buoscio, Merrillville, Ind., Carl B. Frankel, Pittsburgh, Pa., for defendants-appellees.

Before BAUER, Chief Judge, FLAUM, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Appellants, eleven members of the United Steelworkers of America, Local 1011 (Union), appeal from the dismissal of their suit against their employer, LTV Steel Company (Company),[1] their Union, and var-

---

1. LTV, apparently, is the successor to Jones &    Laughlin Steel, which is the successor to

ious Union officials. The district court dismissed the suit because Appellants' complaint failed to state a claim that was not barred by the statute of limitations. We affirm.

## I.

This appeal centers on the district court's grant of the Appellees' motions to dismiss the Appellants' complaint. In cases such as this, we will accept as true all of the complaint's well pleaded factual allegations and the inferences reasonably drawn therefrom. *Yeksigian v. Nappi,* 900 F.2d 101, 101–03 (7th Cir.1990). Although the complaint in this case is not particularly well pleaded, a story can be gleaned from it (and the appendices integral to it) without undue effort. That story is as follows:

The Appellants were employees of the Company, working in an Indiana plant. Around May 1, 1980, the Company represented to the Appellants that jobs as field motor inspectors, along with improved pay grades and seniority, waited for all who successfully completed a motor inspector apprenticeship training program (ATP), that the only way to become a field motor inspector was through the ATP, that ATP enrollees would be protected from layoffs during their tenure as apprentice motor inspectors, and that the Appellants were a select group uniquely qualified by virtue of their past experience to enter the ATP. Upon hearing this, the Appellants enrolled in the ATP. In so doing they waived their opportunities for enrolling in other apprenticeship training programs.

At about the time the Appellants were enrolling in the ATP, the Company was shutting down parts of the plant and laying off employees, among whom were eight apprentice instrument repairmen and six apprentice electronic repairmen. These employees had the Union's sympathies: it tried to find other jobs for them somewhere in the plant. The Union, wanting jobs, and the Company, wanting motor inspectors, worked out an arrangement around January 12, 1981, whereby the Company created an eight week accelerated motor inspector training program (AMITP I) into which the laid-off employees, without posting or bidding, were matriculated. The employees trained, graduated, and obtained jobs as field motor inspectors before the Appellants completed their training in the ATP. AMITP I was such a success, and the Company's need for motor inspectors was still so acute, that around July 13, 1981 the Company instituted AMITP II. Matriculated therein, with assent and encouragement of the Union, and again, without posting or bidding, were 16 electrical shop unit employees. These employees, like their counterparts in AMITP I, trained, graduated, and obtained jobs as field motor inspectors before the Appellants completed their training in the ATP.[2]

At all times during which the training slots of AMITP I and AMITP II were being filled, the Appellants, by virtue of their seniority, training, and work experience, were the most qualified persons for enrollment into the programs. Because the AMITP I and AMITP II training opportunities were not posted and because the Appellants were not allowed to bid for entry into the programs, the Appellants, on July 7, 1981, filed complaints of grievance with the Union alleging that the selection of employees into AMITP I and AMITP II breached the Union/Company collective bargaining agreement (CBA) and the terms of a consent decree earlier entered into by the Company and the United States (Consent Decree I). The Union found the complaints meritorious, at least in part,[3] and proceeded to process them as a grievance through the grievance mechanism established by the

Youngstown Sheet & Tube Company. Appellants have sued all three namesakes. We simply will refer to "the Company."

**2.** By becoming motor inspectors before the Appellants, the AMITP I & II graduates achieved greater seniority. When motor inspector jobs started to dry up in the spring of 1982, the

Appellants—being apprentice motor inspectors, not journeymen like those who completed AMITP I and II—were laid off.

**3.** Evidently, the legality of AMITP I was not grieved by the Union.

CBA.[4] The grievance ultimately made it to arbitration. In a decision issued April 25, 1984, the arbitrator, construing the scope of the grievance as encompassing claims for all plant employees,[5] found that the Company violated CBA section XIII–K, para. 13.26 [6] because it did not post vacancies for AMITP II trainees, thereby preventing most employees from bidding on the AMITP II positions. In an award issued the same day the arbitrator held that the opportunities for 17 positions in the AMITP II programs should be "posted in accordance with Section XIII–K of the Labor Agreement," that "successful bidders shall be chosen on the basis of their qualifications as of late June or early July, 1981," and that "successful bidders who had originally been bypassed" had coming to them "the pay they lost as a result [of being originally bypassed], including the pay they lost if they successfully complete the training program."

Apparently the award left some issues between the Company and the Union unresolved, including the issue of whether CBA section XIII–K required unit or plant-wide posting. The issues were submitted by the two parties for the arbitrator's resolution at a meeting held on August 27, 1984. On that day he promulgated his resolution, determining, among other things, that the accelerated motor inspector training program opportunities were to be "posted on a plant-wide basis."

Around September 26, 1984, and pursuant to the arbitrator's statement of August 27, the Company posted on a plant-wide basis about 30 opportunities for entry into the new accelerated training program, AMITP III. Among the employees bidding for entry into the program were the Appellants who, by virtue of the qualification standard announced by the arbitrator in his award of April 25, were the most qualified of all those bidding. Around November 1, 1984, the Company selected the winning bidders, among whom were certain "phantom bidders" later removed after the selection, but none of the Appellants. The Company's selection occurred after Union attempts to influence the Company's choice of the successful bidders. Those attempts continued even after the AMITP III selection: the Union tried to influence the makeup of the AMITP III trainees by attempting to induce successful bidders to quit the program. For the Appellants, these attempts led to naught. The Company did not select them for training in AMITP III.

Apparently, the motive behind the Company's selection behavior was to reduce the Company's potential liability for back pay.[7] When the Appellants inquired of the Company about why they had not been selected this motive was concealed, the Company explaining to the Appellants—nine of whom are white, two of whom are black—that its particular selection was required by Consent Decree I.

This explanation failed to satisfy the Appellants. Between January 30, 1985 and March 20, 1985, the Appellants filed with

4. In the meantime, one of the Appellants, Nordyke, filed a complaint with the Audit & Review Committee, an institution created by Consent Decree I to monitor continued compliance with the Decree's mandate. The Committee determined that the Company did not violate Consent Decree I by instituting AMITP I & II as it did. It ruled that "where a need for trained craftsmen exists at a plant, it is not a violation of Consent Decree I for the company to select for training purposes those employees who, by reason of experience or otherwise, require the shortest period of training in order to fill the vacancies."

5. Although the Union originally pursued the grievance on behalf of those, including Appellants, in the "FM," or field maintenance, work unit, it later argued that the Company's creation

and staffing of AMITP II discriminated against all plant employees, not just the unit employees, and that the grievance was asserted on behalf of all plant employees. The Company tried to restrict the scope of the grievance, but failed.

6. This paragraph provides, in part, as follows:
When a permanent vacancy develops, or is expected to develop (other than a temporary vacancy) in the promotional line in any seniority unit, Management shall post notice of such vacancy or expected vacancy or job assignments where such is the present practice, for such period of time and in such manner as may be appropriate at each plant.

7. The motive behind the Union's attempts to influence the composition of AMITP III trainees is not alleged.

the Union complaints of grievance. The complaints alleged, among other things, that the AMITP III posting and selection process violated the CBA and the arbitrator's award of April 25, 1984 because (1) the posting and notice of the bid for AMITP III was posted plant-wide, instead of FM unit-wide, (2) the successful bidders were not chosen on the basis of qualifications as of June or July, 1981, and (3) the Appellants were not chosen. The Union did not see any merit in the complaints. It refused to process them through the CBA's grievance mechanism.

The Appellants then filed their complaint.

## II.

Filed April 23, 1985, the Appellants' complaint reads in six counts. In Count I the Appellants allege that contrary to the CBA and the arbitrator's award of April 25, the Company posted AMITP III openings plant-wide, rather than unit-wide, and it neglected to select the Appellants as AMITP trainees, despite their qualifications. Pursuant to 9 U.S.C. § 9, the Appellants seek to have confirmed the arbitrator's award of April 25. They also seek an order requiring the Company to enroll them in AMITP III and pay them back pay totalling $2,000,000. In Count II the Appellants allege that the Company and Union "prompted" the arbitrator "to tamper" with his decision of April 25, resulting in his issuance of the statement of August 27, and causing 9 U.S.C. §§ 9, 10 & 11 and 29 U.S.C. § 173(d) to be violated. Further, the Appellants allege that the Company's posting and selection process violated CBA section XIII–K and the April 25 award. Apparently pursuant to 29 U.S.C. § 185 and provisions of 9 U.S.C. § 1, *et seq.*, the Appellants seek injunctive relief and damages, including punitive damages, totalling $5,000,000. In Count III the Appellants allege that the Company violated CBA section XIII–K and the April 25 award in posting plant-wide the AMITP III openings and in failing to award them a position in AMITP III. Pursuant to 28 U.S.C. §§ 2201 & 2202, the Appellants seek a declaration

that they were the most qualified bidders and, apparently pursuant to 29 U.S.C. § 185, they seek damages totalling $5,000,-000. In Count IV the Appellants allege that the Union and the Company "careless[ly] and negligent[ly] and/or willful[ly] and intentional[ly]" breached, among other things, the CBA, an implied contract between the Company and the Appellants, and statutory duties under 29 U.S.C. §§ 158(b)(1), (2) & (4) and (a)(1) & (3), by "advancing" certain persons in AMITP I and AMITP II. Pursuant to 29 U.S.C. §§ 185 and 187, the Appellants request back pay and damages totalling $22,000,-000. In Count V the Appellants allege that the Union breached the duty of fair representation it owed them by (1) protecting laid off employees in the AMITP I and AMITP II programs, (2) refusing to enforce under 9 U.S.C. § 9 the April 25 arbitrator's award, (3) causing the arbitrator to issue the statement of August 27, (4) attempting to influence the selection of AMITP III participants and further attempting to induce AMITP III participants to leave the program, and (5) refusing to process the Appellants' grievances. Apparently pursuant to 29 U.S.C. § 185, the Appellants request damages, including punitive damages, totalling $15,000,000. In Count VI the Appellants allege that the Company's failure to find a spot for the Appellants in AMITP III was reverse discrimination, and that the Company, the Union, and the arbitrator violated 42 U.S.C. § 2000e–2(h) and the fifth amendment. Pursuant to 42 U.S.C. §§ 1981, 1983, 1985(2) & (3), and 1986, the Appellants request orders setting things aright, and back pay and damages, including punitive damages, totalling $21,-000,000.

The district court interpreted the complaint as, at most, alleging nothing more than a "hybrid" section 301/fair representation case. *See generally Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). Its interpretation is correct. Although the Appellants have claimed violations of, or the right to proceed under, various provisions of federal law other

than section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, a look at the complaint (once it is deciphered) shows that Appellants' assertion of claims based on those provisions is wholly untenable.

Take, for example, the Appellants' alleged right to "confirm" the arbitrator's award of April 25, 1984. The Appellants assert that their right derives from section 9 of the Federal Arbitration Act (FAA), 9 U.S.C. § 9. But in the labor law context it is well established that the standards of the FAA are "superceded" by LMRA section 301. *Miller Brewing Co. v. Brewery Workers Local Union No. 9*, 739 F.2d 1159, 1162 (7th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 926 (1985). *See also General Electric Co. v. Local 205, United Electrical Workers*, 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957) (relying on LMRA section 301 rather than construing predecessor of the FAA); *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 466–68, 77 S.Ct. 912, 926–27, 1 L.Ed.2d 972 (1957) (Frankfurter, J., dissenting) ("I find rejection, though not explicit, of the availability of the [FAA] to enforce arbitration clauses in collective bargaining agreements in the silent treatment given that Act by the Court's opinion."); *LaBuhn v. Bulkmatic Transport Co.*, 865 F.2d 119, 120 (7th Cir.1988) ("Section 301 of the [LMRA] ... occupies the entire field of disputes over collective bargaining con-

tracts."). In seeking to confirm an arbitration award created by virtue of a collective bargaining agreement, recourse is to the LMRA, not the FAA.[8] But under the LMRA Appellants have no standing simply to ask for a confirmation of the award. *Shores v. Peabody Coal Co.*, 831 F.2d 1382 (7th Cir.1987); *Anderson v. Norfolk & W. Ry. Co.*, 773 F.2d 880 (7th Cir.1985). Employees represented by a union are not parties to the collective bargaining agreement or any union-company arbitration. *Shores*, 831 F.2d at 1383–84. Generally, then, they cannot challenge, modify, or confirm the award in court.· *See id.* To this rule there exists two exceptions: The first, established in *F.W. Woolworth Co. v. Miscellaneous Warehousemen's Union, Local No. 781*, 629 F.2d 1204 (7th Cir.1980), *cert. denied, F.W. Woolworth Co. v. Fell*, 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981), but inapplicable here, allows employees to defend against a suit seeking to vacate an arbitration award favorable to the Union when the Union chooses not to but otherwise acquiesces in the employees' action; the second, established by a long line of cases and applicable here, allows employees to challenge or confirm a union-company arbitration award *but only if* the employees state a claim for a section 301/fair representation case and the challenge or confirmation is integral to the case. *See, e.g., Anderson*, 773 F.2d at 882.

8. Appellants also allege that the Company and Union violated 9 U.S.C. §§ 9, 10, and 11 by submitting to the arbitrator certain issues that led to his statement of August 27. The Appellants allege that the August 27 statement was an illegal modification of the April 25 award; the Union and Company violated the above mentioned sections of the FAA because the April 25 award "can be confirmed, vacated, reheard, modified or corrected *only* in the United States District Court." (Emphasis added). But the FAA could not have been violated; Appellants miss its import completely. The FAA allows certain persons—parties to the arbitration—under certain conditions to apply to the district court for a confirmation, vacation, or modification of the award. *See* 9 U.S.C. § 9 ("any party to the arbitration may apply to the court"); 9 U.S.C. § 10 ("upon application of any party"); 9 ·U.S.C. § 11 (same). But it does not limit the means by which these persons can confirm, vacate, or modify the award to the court alone.

The FAA is an enabling statute, not a proscribing one. In general, it does not restrict the parties from seeking additional guidance from the arbitrator; in fact, it encourages it. "Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit." *Volt Information Sciences, Inc. v. Trustees of the Leland Stanford Junior University*, 489 U.S. 468, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989).

Appellants further claim that their consent was needed before the Company and the Union could submit issues to the arbitrator for resolution on August 27. But the Appellants are not parties to the arbitration agreement—the CBA— nor were they parties to any arbitration proceeding. Thus, the fact that the Union and the Company did not obtain their "consent" simply is of no consequence, at least as regards the FAA.

This second exception, of course, brings us full circle.[9]

Take also, for another example, the Appellants' alleged claims under the fifth amendment and the civil rights laws. The Appellants have nowhere asserted that state action caused or otherwise was involved in their purported woes. Yet absent the requisite governmental action, there can be no claim for a denial of constitutional due process. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350–51, 354, 95 S.Ct. 449, 453–54, 455, 42 L.Ed.2d 477 (1974); *Anderson v. National R.R. Passenger Corp.*, 754 F.2d 202, 204–05 (7th Cir.1984) (per curiam). Nor can there be one for a violation of 42 U.S.C. § 1983, as the Appellants concede. And although the Appellants have asserted in their complaint that they are victims of "reverse discrimination," they contradict themselves by conceding that two of their eleven are not white but black—employees hard pressed to assert a reverse discrimination claim with a straight face—and by conceding that the real reason allegedly behind the Company's purported maneuvering was to avoid back pay, not to discriminate on account of race (or any other suspect classification). In their brief, the Appellants attempt to convince us that "[i]t is immaterial whether or not the employee/plaintiffs are white or black." We think otherwise, however; actions under 42 U.S.C. §§ 1981, 1985(2), 1985(3), and (derivatively) 1986 all rely on the existence of racial or other class-based invidious discriminatory animus. *Lowe v. Letsinger*, 772 F.2d 308, 311 (7th Cir.1985). *See Williams v. St. Joseph Hosp.*, 629 F.2d 448, 452 (7th Cir.1980) (concerning 42 U.S.C. § 1986). *See also International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335, 353, 97 S.Ct. 1843, 1854, 1863, 52 L.Ed.2d 396 (1977) (concerning 42 U.S.C. § 2000e–2(h)). The Appellants' concessions remove from the complaint any hint of this necessary animus. Those concessions (along with a myriad of other things we will not delve into here) prove fatal to the Appellants' civil rights claims.

All told,[10] the only claim of arguable merit in the Appellants' complaint is a section 301/fair representation claim. From here on, then, we direct our attention only to it.

### III.

The district court concluded that the Appellants may have stated a section 301/fair representation claim. To do so they had to allege that the Company violated LMRA section 301 by breaching the CBA and that the Union breached its duty of fair repre-

---

**9.** The Appellants argued at oral argument that their inability to enforce the April 25 award under the FAA and the Union's refusal to do so under the LMRA deprives them of due process in violation of the fifth and fourteenth amendments. Because they were unable to adjudicate the April 25 award, which had "ripened" into a valuable "property" benefit for them, the FAA is unconstitutional on its face and as applied. This argument is so meritless that we are loath to discuss it. Suffice it to say that the FAA does not prevent the Appellants from doing anything—as we noted it is an enabling statute, not a proscribing one. They simply have no standing under it, and a lack of standing, to our knowledge, has never led to a constitutional violation. The Appellants' real argument is not with the FAA, but with the Union, for the Union has refused to do the Appellants' bidding. But the Union is not a government actor, so it could not violate the constitution.

In any case, the Appellants do have standing under the labor laws to sue the Union for refusing to enforce the April 25 award. In fact, they have availed themselves of such standing for this case. This affords them the due process they seek. The Appellants' due process has not disappeared. It's right under their noses.

**10.** In its order entered February 16, 1986, the district court, in addition to disposing of Appellants' FAA and civil rights claims, disposed of claims or jurisdictional assertions relating to 29 U.S.C. § 173(d) (merely a statement enunciating a policy), 28 U.S.C. §§ 2201 and 2202 (does not extend subject matter jurisdiction), 28 U.S.C. § 1332 (complete diversity of citizenship lacking), 29 U.S.C. § 187 (relates only to illegal secondary boycott situations), and 29 U.S.C. § 158 (power to initiate action lies solely with the National Labor Relations Board). The court's disposition of these claims or assertions was correct; its conclusions require no discussion.

The court did not discuss Appellants' incipient allegations of Company misrepresentations. As for those, *see Gibson v. AT & T Technologies, Inc.*, 782 F.2d 686 (7th Cir.), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986).

sentation, which is implied from the scheme of the National Labor Relations Act, by mishandling an ensuing grievance and arbitration proceeding.[11] *Reed v. United Transp. Union*, 488 U.S. 319, 109 S.Ct. 621, 627, 102 L.Ed.2d 665 (1989); *Thomas v. United Parcel Service, Inc.*, 890 F.2d 909, 914 (7th Cir.1989). This they appeared to do: The Appellants alleged that the Company breached the CBA several times—when it instituted and staffed AMITP I and AMITP II, when it posted plant-wide bid opportunities for AMITP III, and when it selected the successful bidders for AMITP III; they also alleged that the Union breached its duty of fair representation several times—when it protected laid off employees in AMITP I and AMITP II, when it refused to enforce the arbitrator's award of April 25, when it caused the issuance of the arbitrator's statement of August 27, when it attempted to influence the composition of the AMITP III trainees, and when it refused to process the Appellants' 1985 grievances. But no matter, concluded the court. The Appellants' suit was bound for dismissal, for even if Appellants stated a section 301/fair representation claim, the claim was time barred.

A six-month limitation period applies to section 301/fair representation actions. *Del Costello v. International Bhd. of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *Landahl v. PPG Indus., Inc.*, 746 F.2d 1312 (7th Cir.1984); *Metz v. Tootsie Roll Indus., Inc.*, 715 F.2d 299, 303 (7th Cir.1983), *cert. denied*, 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984). Generally, the limitations period begins to run " 'when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts

constituting the alleged [violation].' " *Metz*, 715 F.2d at 304 (quoting *Hungerford v. United States*, 307 F.2d 99, 102 (9th Cir.1962)). Where an egregious decision is made with consequences to follow later, the period runs from the date of the decision's communication, not the date of the consequences, "because on that date the employees know *or could discover* that they have a potential claim." *Bonds v. Coca–Cola Co.*, 806 F.2d 1324, 1326 (7th Cir.1986) (emphasis original). The egregious decision is usually a union's decision to grieve no more, since grievance and arbitration procedures in which a union may breach its duty usually follow a company's breach of contract. Thus, a section 301/fair representation claim usually "accrues from the time a final decision on a plaintiff's grievance has been made or from the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, that no further action would be taken on his grievance." *Richards v. Local 134, Int'l Bhd. of Elec. Workers*, 790 F.2d 633, 636 (7th Cir.1986). In this case, the district court believed that the "final decision" occurred on August 27.

The court construed the complaint as being, basically, one long lament about the arbitrator's August 27 decision: the Company's and Union's actions pre-August 27 led to the decision, the Company's and Union's actions post-August 27 were a consequence of it.[12] Hence, "any claim by the [Appellants] relating to their grievances and the arbitration awards ... would have accrued *as a matter of law* not later than August 27, 1984 when the second decision was rendered." August 27, however, was more than six months prior to April 23, 1985, the date the complaint was filed.

---

**11.** Breaches of the duty of fair representation can come in contexts other than grievance and arbitration procedures. The cases generally " 'take two forms:' those claiming a breach in the negotiation of a collective bargaining agreement and those alleging a breach in the administration of such an agreement." *Thomas v. United Parcel Service, Inc.*, 890 F.2d 909, 918 (7th Cir.1989). *See also Schultz v. Owens–Illinois, Inc.*, 696 F.2d 505, 514 (7th Cir.1982). This case, of course, deals only with the latter context.

**12.** Granted, many of the Company's and Union's pre-August 27 actions led also to the arbitrator's April 25 decision and many of the Company's and Union's post-August 27 actions were a result of it, but the Appellants had no plaint with the April 25 decision and, in any case, it was made earlier than the one on August 27. The point for the court was to find the latest date on which Appellants could base their claim. Since April 25 was earlier than August 27, April 25 could be ignored for all practical purposes.

Thus, concluded the court, the Appellants' purported section 301/fair representation claim was barred.

■■■ We cannot agree with the district court. Granted, much of the Appellants' inveighing is directed at the arbitrator's August 27 statement, and many of the breaches alleged in the complaint either culminate in or are a consequence of the August 27 statement (or the earlier decision of April 25). Specifically: The causes of action concerning the Company's and Union's purported AMITP I and AMITP II breaches at the latest began to run on August 27, since August 27 was the last word on how those breaches would be settled. Some of the causes of action concerning the Company's and Union's purported AMITP III breaches, such as posting plant wide, began to run on August 27, even though allegedly committed afterwards, since by August 27 it was clear that the decision to take the offensive action had been made and communicated. The causes of action concerning the Union's refusal to enforce the April 25 award and its causing the creation of the August 27 award began to run on August 27, since by that date it was clear, or should have been, that the Union caused the issuance of the August 27 statement and was not going to enforce the Appellants' version of what the April 25 award mandated.[13] And the cause of action concerning the Union's refusal to grieve the Appellants' 1985 complaints, to the extent the complaints rehashed old issues such as plant wide posting, similarly began to run on August 27, since by that date the Appellants should have known that the issues were dead, settled, and not to be grieved anymore.[14] Still, the statement of August 27 is not the be all and end all of Appellants' complaint. The complaint contains allegations of breaches unconnected with August 27 or any earlier date, allegations of breaches within the six month limitations period.

The Appellants allege, among other things, that the Company breached the CBA by not *selecting* AMITP III trainees on the basis of those bidders who were

---

**13.** The Appellants argue that the statute of limitations did not begin to run on the Union's purported breach of refusing to enforce the April 25 award because under the FAA, the Union has one year from the date of the award to confirm it in district court. *See* 9 U.S.C. § 9. If the Union could wait until April 25, 1985 to confirm the arbitrator's award of April 25, 1984, how could the statute of limitations have begun to run before April 25, 1985? The simple answer is that an arbitrator's award is considered final, a subsequent period of time for judicial review notwithstanding, and that the statute of limitations period begins on the date of the award. *Freeman v. Local Union No. 135*, 746 F.2d 1316, 1319 (7th Cir.1984). *See also Shores v. Peabody Coal Co.*, 831 F.2d 1382, 1384 (7th Cir.1987); *Bonds v. Coca–Cola Co., supra*, 806 F.2d at 1326. But this is too simple, for *Freeman* and its progeny are concerned with an arbitrator's award *adverse to employees* being final, not one *in their favor*. If an arbitration award is in favor of the Union and employees, as is this one, it can hardly be the final, *adverse* decision required to turn the limitations clock. The better answer is that there is no need for "confirmation" of· a favorable award until a company does something that suggests the award will not be complied with, and, hence, no duty on the part of the union to seek a confirmation, if ever, until that time.

We need not decide what the union's duty, if any, is when a company takes steps that suggest the award will not be complied with, nor need we decide from what date, if any, the statute of limitations runs after the company takes such steps and the union refuses to confirm the award; we are not faced with such a case. It is obvious that the August 27 decision mandating plant wide posting did not "violate" the April 25 award, as Appellants suggest. And assuming, *arguendo*, that it did, it is obvious that the statute of limitations started running on August 27, since, per *Freeman* and its progeny, adverse arbitration decisions are final decisions for purposes of section 301/fair representation claims. What the Appellants really are complaining about is not the Union's "failure" to "confirm" the April 25 award, but its refusal to vacate the one from August 27. Such a case is exactly what *Freeman* was meant for.

The Appellants also argue that they were never given formal notice of the "final decision" that started the statute of limitations clock running, and that this lack of formal notice deprived them of due process in violation of the fifth and fourteenth amendments. It did not. *See Clift v. International Union, United Automobile Workers*, 818 F.2d 623, 630 (7th Cir.1987), *vacated on other grounds*, 488 U.S. 1025, 109 S.Ct. 830, 102 L.Ed.2d 963 (1989).

**14.** Moreover, the Union's breach relating to its "attempt to influence" the makeup of AMITP III trainees is no breach at all: an "attempt" won't do; results are necessary.

most qualified in June or July 1981, *i.e.*, themselves. There is no way the Appellants could have known that this alleged breach was forthcoming before the date on which it occurred—November 1 (or thereabouts). And the breach cannot be tied back to the arbitrator's decision of August 27, which makes no mention of it, nor to the arbitrator's decision of April 25, which mandates the opposite, nor to any earlier decision. This breach by the Company—improper selection of AMITP III trainees—did not occur until approximately November 1 and could not have been known by the Appellants before then.

In 1985, the Appellants then complained about the November 1 breach to the Union. Because the November 1 breach cannot be tied back to an earlier decision, the 1985 complaints about that breach also cannot be tied back, not to August 27, not before. Of course, the Union refused to grieve the 1985 complaints, and the Appellants allege that its refusal was a breach of its duty of fair representation. This alleged breach is something new and different from what the Union had done before; it did not "accrue" until at least the date the Union decided to refuse to process the grievance complaints—sometime after January 30, 1985.

These allegations satisfy the statute of limitations. Both November 1, 1984 and January 30, 1985 are within the six-month period preceding April 25, 1985, the date on which the Complaint was filed. Accordingly, Appellants' purported section 301/fair representation claim—the one relating to the Company's November 1 breach of the CBA via its improper *selection* of AMITP III trainees and the Union's subsequent breach of its duty of fair representation via its refusal to grieve Appellants' 1985 complaints (to the extent they concern the improper selection)—is not time barred.

█ It is, however, barred, period. Some of Appellants' allegations may satisfy the statute of limitations, but those that do fail to state a claim for which relief may be granted.

█ A prerequisite to maintaining a section 301/fair representation suit is a legally sufficient claim that the union breached its duty of fair representation. *See, e.g., Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1178 (7th Cir.1987). In this circuit, to state such a legally sufficient claim employees must allege facts from which the Court can deduce that the union, in taking some action adverse to the employees, engaged in wrongful behavior. *See generally Hoffman v. Lonza, Inc.*, 658 F.2d 519 (7th Cir.1981). " 'Mere negligence' or even 'gross negligence' on the part of a union is insufficient . . .; plaintiffs must show instead that a union engaged in 'intentional misconduct.' " *Adams v. Budd Co.*, 846 F.2d 428, 432–33 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989). Thus, employees must allege that the union intended to deprive them of their contract rights, *Steffens v. Brotherhood of Ry. Employees*, 797 F.2d 442, 445 (7th Cir.1986), or that it discriminated against them for forbidden reasons, *Camacho v. Ritz–Carlton Water Tower*, 786 F.2d 242, 244 (7th Cir.), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986), or that it sabotaged a possibly meritorious grievance because of personal enmity, *Dober v. Roadway Express, Inc.*, 707 F.2d 292, 294 (7th Cir.1983), or that it intentionally undermined a grievance on the basis of political allegiances within the union, *Thomas v. United Parcel Service, Inc.*, 890 F.2d 909, 923 (7th Cir. 1989), or that it otherwise "intentionally caus[ed] harm to an employee" through "fraud, deceitful action or dishonest conduct." *Hoffman*, 658 F.2d at 522. The allegation must focus on "motive rather than result," *Camacho*, 786 F.2d at 244; employees must allege not only what the union did, but why or how. In their complaint, the Appellants do this to some extent. For example, they allege that the Union's actions in supporting AMITP I and AMITP II were "careless and negligent and/or willful and intentional" breaches of "covenants, arrangements and agreements." But regarding the only alleged breach still before us—the Union's failure to grieve the Appellants' 1985 complaints—the Appellants go no further than to state

plainly that the Union's "continuing refusal to process any further grievances of the plaintiffs constitute [sic] a breach of the Union's duty." This will not do. A union does not breach its duty of fair representation by refusing to process grievances, without more. *Mechmet*, 825 F.2d at 1180. *See also Camacho*, 786 F.2d at 245. And we need not countenance the Appellants' *conclusory* allegations to the contrary. *See Archie v. Chicago Truck Drivers Union*, 585 F.2d 210, 219 (7th Cir.1978); *Williams v. General Foods Corp.*, 492 F.2d 399, 405 (7th Cir.1974). What the Appellants needed to allege, at least, were facts showing that the Union intentionally failed to reasonably discharge its role as a grievance advocate. *See Thomas*, 890 F.2d at 922–23. These facts are not in the complaint. Consequently, the Appellants have failed to state a claim not barred by the statute of limitations.

AFFIRMED.