958 F.2d 1429
 139 L.R.R.M. (BNA) 2943, 121 Lab.Cas. P 10,068
 Cherie BENNETT, Plaintiff-Appellee,
v.
LOCAL UNION NO. 66, GLASS, MOLDERS, POTTERY, PLASTICS AND
ALLIED WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,
and Owens-Brockway Corporation,
Defendants-Appellants.
 Nos. 91-1022, 91-1171 and 91-1179.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 26, 1991.
Decided March 25, 1992.
 
 Augustus H. Tabor, William J. Tabor (argued), Terre Haute, Ind., for Cherie Bennett.
 Barry M. Bennett, Asher, Gittler, Greenfield, Cohen & D'Alba, Chicago, Ill., Jerry Ulrich, New Albany, Ind., Carl S. Yaller (argued), Glass, Molders, Pottery, Plastics & Allied Workers, Media, Pa., for Glass, Molders, Pottery, Plastics and Allied Workers Intern. Union, AFL-CIO, CLC, Local Union No. 66.
 Michael Rosiello, Douglas J. Heckler (argued), Barnes & Thornburg, Indianapolis, Ind., for Owens-Brockway Corp.
 Before CUDAHY and RIPPLE, Circuit Judges, and ENGEL, Senior Circuit Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 This appeal involves a hybrid breach of contract/duty of fair representation action brought under section 301 of the Labor Management Relations Act. Cherie Bennett was an employee of Owens-Brockway Corporation. Upon completion of her 30-day probationary period she was given her union card and welcomed into the union by the union president, who also told her that there would be no extension of the probationary term. Several days later union representatives including the president met with company officials and agreed to extend retroactively Bennett's probation. The purported change in Bennett's status (which no one told Bennett about) allowed the company manager to fire her summarily a few days later. The union then claimed its hands were tied: since Bennett was now a probationary employee, she was not entitled to the union's protections under the labor contract. Bennett sued, alleging that the company breached the labor contract and that the union breached its duty of fair representation. After a bench trial, the district court found in favor of Bennett and awarded her damages. Because the lower court applied the correct legal standards and made no clearly erroneous findings of fact, we affirm.
 
 I.
 A. Background
 
 2
 The facts are as follows.[1] David Williams, the plant manager at Owens-Brockway Corporation's plant in Sullivan, Indiana, hired Cherie Bennett as a packer and inspector on April 13, 1988. He informed her that she would be a probationary employee for 30 days; after that point she would enter the Union (Local 66 of the Glass, Molders, Pottery, Plastics and Allied Workers International Union) and her wage would be increased. Several other probationary employees were hired at or near the same time as Bennett. Williams also told Bennett that she had to take and pass a drug test, which the Company would schedule at a local hospital. On April 15, 1988, Bennett began work at the plant. During her first 30 days Bennett missed one day of work, due to illness. She called the Company and reported her illness. During Bennett's first 30 days of work, nothing was said to her by any Union representative regarding the probationary period, nor was the drug test conducted.
 
 
 3
 On May 15, 1988, her 31st day of employment, Bennett encountered Jay Slater, the Union president, in the Company's break room. Slater filled in and signed her Union card, gave her the card along with a copy of the collective bargaining agreement and the Union's constitution, and welcomed her into the Union. The Union card certified that Bennett was a member of the Union as of May 15, 1988. Slater informed Bennett that the Union held monthly meetings and that she was welcome to attend.
 
 
 4
 Because she had heard rumors that the probationary period for some of the new employees might be extended to 60 days, Bennett asked Slater whether there was any truth to the rumors. Slater informed her that the rumors were not true, stating, "That's David's [Williams] problem. He's had thirty days to take care of that."
 
 
 5
 The next day, May 16, Bennett missed work due to car problems she experienced on the way to the plant. She telephoned the Company and spoke to Mr. Hartman, her supervisor, who advised her to wait 30 minutes for him to drive to get her. When Hartman did not arrive after 45 minutes, Bennett walked home. She returned to work on May 17, and received a written warning regarding her May 16 absence. The warning noted that "it is also on record that there was an unexcused absence while being a probationary employee." Diane Pesch, a Union representative, was present when the warning was given and signed the document as the Union's agent.
 
 
 6
 The warning classified Bennett's May 16 absence as a "no report--no show." This classification was inaccurate because she had in fact called to report her difficulties; she had also reported her earlier absence due to sickness. (Under the Company's attendance policy, an unreported absence is treated more severely than an absence for which notice is given.) Bennett protested the warning and spoke to Pesch about filing a grievance. Pesch explained the grievance procedure and offered to speak with Slater.
 
 
 7
 On May 18, Bennett attended the Union's monthly meeting and was introduced by Slater as the only new employee of the Union in attendance. After the meeting Bennett asked Slater and Pesch about the May 17 warning. Slater responded that he had not had an opportunity to speak with Williams but was following up on the matter.
 
 
 8
 On May 19, the Union's business committee met with plant manager Williams. Attending for the Union were Slater, Darrell Hinton (the Union vice president), Gina Lovellette and Ardath Drake. The meeting participants discussed Bennett and other employees hired at about the same time, and an argument erupted between Slater and Williams over the Union cards that Slater had issued to this group of employees. Eventually Williams and Slater agreed to make a retroactive extension of the probationary period for Bennett and other workers. Williams insisted that everyone at the meeting agree to the retroactive extension, but Ardath Drake refused. She protested that the employees had been given their Union cards, that Bennett had attended a Union meeting and that Bennett had initiated a grievance. The others agreed to the retroactive extension. Bennett's work performance was also briefly discussed at the meeting. Williams noted that Bennett already had two absences. Drake became concerned that Williams would fire Bennett; she stated that she had warned Slater prior to the completion of the 30-day period that once Bennett was admitted to the Union it would have to take care of her.
 
 
 9
 Bennett was not informed of the May 19 meeting. She worked her shift on May 21 without incident. On May 22, Bennett injured her knee while at home and sought emergency medical treatment at a hospital. A physician advised her that she would not be able to work, and Bennett obtained two written medical excuses. Bennett telephoned her supervisor on the day of her injury to report her absence. The next day, May 23, she went to the plant (on crutches and wearing a knee immobilizer) to see Williams. She gave him medical verification for the injury and requested a leave of absence. Williams told Bennett to return the next day because he needed to speak with her supervisor.
 
 
 10
 On May 24, Bennett returned to see Williams, whereupon he informed her that she was fired for missing too many days. Williams stated that Bennett was not in the Union and was still a probationary employee. After being fired, Bennett went to Slater's home to discuss the matter. Slater said that he did not think Williams was right and that he would try to work things out with Williams. Slater later spoke to Williams, who said that he was being as fair as he could be. Slater made no further investigation of the incident, and did nothing to pursue either the initial grievance regarding the absence warning or any issues involving Bennett's termination.
 
 B. District Court Proceedings
 
 11
 Bennett brought a hybrid section 301 suit under the Labor Management Relations Act, 1947, 29 U.S.C. § 185, alleging that the Company breached the collective bargaining agreement and that the Union breached its duty of fair representation. A bench trial was held on December 15, 1989.[2] After finding the above facts, the district court concluded that the Company breached the collective bargaining agreement. The court reasoned that a retroactive extension of Bennett's probationary period was not possible without her consent because her rights had become "vested" after the 30-day point; "the Company simply waited too long to obtain an extension of probation." Order at 14.
 
 
 12
 The court also found that the Union breached its duty of fair representation: "[N]ot only did the Union fail to investigate the merits of her initial grievance and the facts surrounding her discharge, but in a concerted effort with the Company, it turned its back on Bennett and attempted to deprive her of her protected status." Order at 18. The court found bad faith and intentional misconduct in the Union's "deceitful scheme to retroactively extend the probationary period." Id.
 
 
 13
 The lower court awarded Bennett backpay and attorney's fees as damages (the latter because her costs in bringing this suit were necessitated by the Union's failure to represent her). Because it found that the Union and the Company participated in each other's breach, the court imposed joint and several liability rather than apportioning damages.
 
 II.
 
 14
 In reviewing a judgment following a bench trial, we must accept the lower court's factual findings unless they are clearly erroneous. Fed.R.Civ.P. 52(a). Because of "the unique opportunity afforded the trial court judge to evaluate the credibility of witnesses and to weigh the evidence," our review does not allow us to upset the judge's findings unless we are left with the "definite and firm conviction that a mistake has been committed." Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 855, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). We may have such a conviction if "the trial judge's interpretation of the facts is implausible, illogical, internally inconsistent or contradicted by documentary or other extrinsic evidence." Ratliff v. City of Milwaukee, 795 F.2d 612, 617 (7th Cir.1986). Where two permissible conclusions may be drawn from the evidence, the factfinder's choice between them is not clearly erroneous, even though we might be convinced that we would have weighed the evidence differently. Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985).
 
 A. Section 301 Liability
 
 15
 In a hybrid breach of contract/duty of fair representation action brought under section 301 of the Labor Management Relations Act, an employee must satisfy two prerequisites. To prevail against either the Company or the Union, the plaintiff must establish both that the Company breached the collective bargaining agreement and that the Union breached its duty of fair representation. DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 163, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983).
 
 
 16
 A great deal in this case turns on an initial question: Was Cherie Bennett a probationary employee at the time she was terminated? The Company's entire defense is that Bennett was probationary--through a legitimate extension of her probationary term--and therefore could be fired summarily. The Union also rests much of its case on the claim that it properly negotiated an extension of Bennett's probationary period. We begin, then, with the issue of Bennett's status, and then turn to the two essential predicates of a hybrid section 301 claim.
 
 1. Bennett's Status
 
 17
 The collective bargaining agreement provides for a "thirty (30) day probationary period (sixty (60) days if mutually agreeable to extend probation)." Union Br.App. at 38. Employees "become and remain members of the Union" upon completion of the probationary period. Other benefits provided by the agreement are secured by the attainment of nonprobationary status; in particular, Article 3, Section 3 provides: "The discharge of a new employee during his thirty (30) day probationary period (sixty (60) days if mutually agreeable to extend probation) shall not be a matter for grievance." Id. Thus under the agreement Union membership and nonprobationary status are triggered simultaneously. See also Record, Pleadings, Doc. 16 (Union Trial Br.), at 15; Tr. at 133-34, 150-51.
 
 
 18
 The parties do not question the district court's finding that Bennett initially became a nonprobationary employee on her 31st day of employment (May 15), when Slater welcomed her into the Union and told her that her probationary term was over. The Union and the Company argue, however, that they could properly extend her probation to 60 days on her 35th day of employment (May 19). They contend that the retroactive extension was consonant with the collective bargaining agreement and that the concept of "vested" rights is inapplicable.
 
 
 19
 The interpretation of an unambiguous contract is a question of law, as is the question whether the contract is unambiguous; as legal questions, both are subject to de novo review. See In re Vitreous Steel Prods. Co., 911 F.2d 1223, 1237-38 (7th Cir.1990). These standards apply to collective bargaining agreements as they do to other contracts. See, e.g., International Ass'n of Machinists & Aerospace Workers v. General Electric Co., 865 F.2d 902, 905 (7th Cir.1989). The agreement between Owens-Brockway and Local Union No. 66 provides that employees shall become and remain Union members and nonprobationary employees after 30 days, or after 60 days "if mutually agreeable to extend probation." This language does not explicitly require that an extension take place, if at all, during the first 30 days. Nevertheless, we think that the agreement's terms must mean that extensions can only be obtained during the initial 30-day period, because a contrary interpretation does violence to the language of the contract. If the probationary period could be extended to 60 days at some point after the first 30 days, then the stated 30-day default rule would essentially become meaningless (not just meaningless, but downright deceptive), since all new employees would risk being placed back on probation for the entire first 60 days. Thus, any new employee could have her probation "extended" on her 59th day of work. Counsel for the Union conceded at oral argument that its interpretation effectively amounted to a 60-day probationary period for all new employees. Rather than completely read the "30-day" language out of the contract, we adopt what seems the natural and obvious construction: the word "extend" contemplates only prospective, not retroactive, extensions. Therefore a probationary period can be extended to 60 days only during the first 30 days of employment.
 
 
 20
 Not only would the defendants' interpretation ignore the 30-day language in the agreement, but it would conflict with evidence of the parties' understandings of the agreement. Although the district court did not expressly find the agreement unambiguous, we think that the relevant provisions are unambiguous. Even assuming ambiguity, however, we are convinced that the extrinsic evidence considered by the district court supports our interpretation.[3] Most important, the Union's interpretation simply cannot be reconciled with Slater's statement to Bennett on her 31st day of employment--when he denied rumors of an extension--that Williams has "had thirty days to take care of that [extension of probation]." Order at 4.[4]
 
 
 21
 The parties spend considerable energy debating the legal metaphysics of "vestedness." We think the defendants have overestimated the importance of that concept to the district court's decision and to this case. It is perhaps unfortunate that the district court used the language of "vested" rights in concluding that an employee's probation could not be extended retroactively. There is no need to look beyond the collective bargaining agreement in this case, and surely no need to talk about "absolute" or "interminable" rights. The right to nonprobationary status here was wholly a creation of the agreement, and therefore not "vested" in any absolute sense. Cf. Cooper v. General Motors Corp., 651 F.2d 249, 250-51 (5th Cir.1981) (seniority rights under collective bargaining agreement not vested rights); Turner v. Local Union No. 302, Int'l Bhd. of Teamsters, 604 F.2d 1219, 1224-26 (9th Cir.1979) (retiree benefits not vested rights). But under the clear terms of the agreement, Bennett became a nonprobationary employee on her 31st day of employment, and the agreement did not allow for her status to be altered thereafter. We suspect that the district court's reliance on the notion of vested rights was mere shorthand or analogy for an analysis of the agreement itself. In any event, the present dispute does not call for anything so ambitious as an appeal to the nature of vested rights.
 
 
 22
 We also reject the defendants' attempt to characterize their conduct as the product of legitimate negotiations. They cite cases upholding modifications that affect rights under collective bargaining agreements: "Since parties to a labor contract are always free to amend their agreements, we do not see how an amendment through the ordinary processes of collective bargaining can be considered a breach of contract." Waters v. Wisconsin Steel Works of Int'l Harvester Co., 427 F.2d 476, 489 (7th Cir.), cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151, 911 (1970). The flaw in this line of argument is readily apparent when one observes that the "ordinary processes of collective bargaining" were not utilized here. The Union and the Company did not purport to modify or supplement the collective bargaining agreement as it applies to the entire class of employees; instead, they acted on an ad hoc basis, depriving Bennett (and a few other employees) of the nonprobationary status that the agreement had conferred upon them. Indeed, it is telling that the defendants cite numerous cases supporting the validity of "modifications" to collective bargaining agreements, but then assert that their actions did not modify the agreement. There is an important distinction between a negotiated modification of an agreement's terms and an unstated "modification" intended to apply only to selected individuals: we call the latter a "breach."
 
 
 23
 2. The Company's Breach of the Collective Bargaining Agreement
 
 
 24
 Because Bennett was a nonprobationary employee when she was summarily discharged, the Company's entire defense collapses. The district court found that at least two provisions of the collective bargaining agreement were breached. First, Article 10, Sections 1 and 2 provide that the Company shall be reasonable in granting leaves of absence for, inter alia, illness and physical disability. The Company refused to investigate Bennett's injury or to consider her medical documentation, but simply fired her. We agree with the district court that the Company's action was unreasonable. Second, Article 7, Section 3 of the agreement provides:
 
 
 25
 No employee shall be summarily discharged. Employees shall first be suspended pending completion of the Employer's investigation of the incident. The Union President will be notified of the suspension within twenty-four (24) hours. Company will notify the employee of its decision in writing with a copy to the Local Union.
 
 
 26
 That procedure was not followed here. We therefore agree with the district court that Bennett's summary discharge violated the agreement.
 
 
 27
 3. The Union's Breach of the Duty of Fair Representation
 
 
 28
 In order to establish a breach of the Union's duty of fair representation, there must be a showing that the Union's actions were "arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). In addition, this circuit has required plaintiffs to prove intentional misconduct on the part of the Union. Dahnke v. Teamsters Local 695, 906 F.2d 1192, 1197-98 (7th Cir.1990).[5]
 
 
 29
 With the Supreme Court's recent decision in Air Line Pilots Ass'n, Int'l v. O'Neill, --- U.S. ----, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), there may be reason to question the continued vitality of our intentional misconduct standard. In O'Neill, a unanimous Court held two things: first, that Vaca 's tripartite standard--arbitrary, discriminatory or in bad faith--applies to all union activity, including contract negotiation; and second, that a union's actions are arbitrary only if they fall outside a "wide range of reasonableness." Id. 111 S.Ct. at 1130. In so holding, the Court considered and rejected the union's argument that the duty of fair representation prohibits only intentional misconduct:
 
 
 30
 ALPA suggests that a union need owe no enforceable duty of adequate representation because employees are protected from inadequate representation by the union political process. ALPA argues, as has the Seventh Circuit, that employees "do not need ... protection against representation that is inept but not invidious" because if a "union does an incompetent job ... its members can vote in new officers who will do a better job or they can vote in another union." Dober v. Roadway Express, Inc., 707 F.2d 292, 295 (CA7 1983).... Even legislatures, however, are subject to some judicial review of the rationality of their actions.
 
 
 31
 ALPA relies heavily on language in Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953).... In particular, ALPA stresses our comment in the case that "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." Id., at 338, 73 S.Ct., at 686. Unlike ALPA, we do not read this passage to limit review of a union's actions to "good faith and honesty of purpose," but rather to recognize that a union's conduct must also be within "[a] wide range of reasonableness."
 
 
 32
 O'Neill, 111 S.Ct. at 1134 (emphasis in original; citations omitted). The Court proceeded to state that substantive review of a union's conduct must be "highly deferential." Id. at 1135. But the Court's clear validation of "substantive " review is certainly difficult to reconcile with this circuit's intentional misconduct requirement. Examination of actions for intentional misconduct is essentially a subjective inquiry, while examination for reasonableness--even a "wide range of reasonableness"--is an objective one. O'Neill says that a union's failure under the latter inquiry can be sufficient for a breach of the duty of fair representation.
 
 
 33
 We would have relatively little difficulty declaring the Union's actions in this case arbitrary and outside a "wide range of reasonableness." Predictably, it is somewhat harder to find intentional misconduct. We conclude, however, that the district court's findings of bad faith and intentional misconduct on the Union's part are not clearly erroneous. And even if intentional misconduct were no longer necessary to prove a breach of a union's duty of fair representation, it remains sufficient. We therefore have no need at this juncture to decide whether this circuit's heightened standard of intentional misconduct survives O'Neill. The factfinder is entitled to considerable deference, particularly in matters of intent, and we do not disturb the court's finding that Bennett has met even this higher standard.
 
 
 34
 This case is a far cry from the cases in which we have found that plaintiffs failed to meet the standard of intentional misconduct--where the union simply forgot to perfect an employee's appeal, Hoffman, 658 F.2d at 523; Graf v. Elgin, Joliet & Eastern Ry. Co., 697 F.2d 771, 777-78 (7th Cir.1983), where the union considered the merits of a grievance and decided not to pursue it because it was nonmeritorious, Dahnke, 906 F.2d at 1197, and where the union's representation was inept or negligent, Dober v. Roadway Express, Inc., 707 F.2d 292, 294 (7th Cir.1983); Superczynski v. P.T.O. Services, Inc., 706 F.2d 200, 203 (7th Cir.1983). Here the district court found that the union acted not just negligently, but intentionally, in a deceitful scheme to deprive Bennett of her protected status under the collective bargaining agreement. The Union argues that there was no evidence of personal hostility toward Bennett or of any direct misrepresentation made to her, and therefore the district court clearly erred. We think the Union's conception of bad faith and intentional misconduct is too narrow.
 
 
 35
 In Graf, the court discussed Hoffman 's intentional misconduct standard at some length. Judge Posner wrote:
 
 
 36
 The standard is as follows. The union has a duty to represent every worker in the bargaining unit fairly but it breaches that duty only if it deliberately and unjustifiably refuses to represent the worker. Negligence, even gross negligence ... is not enough.... Although extreme recklessness is so close to intentional wrongdoing that the law treats it as the same thing, we need not worry about that refinement in this case....
 
 
 37
 697 F.2d at 778-79 (citation omitted). We have used precisely the same formulation of the duty--the union "deliberately and unjustifiably refuses to represent [the] worker"--in Dober, 707 F.2d at 294, and Superczynski, 706 F.2d at 202.
 
 
 38
 Even more to the point, we have declared that a union's intent to deprive employees of their contractual rights is enough to support a breach of the duty of fair representation. Martin v. Youngstown Sheet & Tube Co., 911 F.2d 1239, 1248 (7th Cir.1990). As we wrote in Steffens v. Brotherhood of Ry. Employees, 797 F.2d 442 (7th Cir.1986):
 
 
 39
 The complaint alleges facts which, if true, would support a finding that the union had breached its duty of fair representation and that the union and employer had colluded to deprive plaintiffs of their rights under the collective bargaining agreement.... This is enough to state a claim for a hybrid duty of fair representation suit.
 
 
 40
 Id. at 445; see also Adams v. Budd Co., 846 F.2d 428, 434 n. 2 (7th Cir.1988) ("Where a contract guarantees representation, an egregious and flat out refusal to represent has the effect of cancelling the contractual guarantee. Hoffman does not (and could not consistent with congressional policy) bar review of an egregious failure to represent contractual rights."), cert. denied, 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989).
 
 
 41
 Personal animosity, then, is not the sine qua non of a breach of the union's duty of fair representation. A union may not refuse to represent an employee for any improper reason, of which personal animosity is just one; "the precise reason is unimportant." Dober, 707 F.2d at 295. When a union deliberately turns its back on an employee and sacrifices that employee's contractual rights, it has acted improperly. Intentionally acting to deprive an employee of her rights under the collective bargaining agreement--whether ultimately out of personal antipathy, political differences or merely to avoid work--constitutes acting for an improper reason, and is thus a breach of the union's duty. Such conduct is a "deliberate and unjustifiable refusal to represent the worker" under Graf, Dober and Superczynski.
 
 
 42
 The next question is whether there was adequate evidence supporting the findings of intentional misconduct and bad faith on the Union's part.[6] Intent is a slippery matter, and deference to the trier of fact is particularly important when it comes to findings involving scienter. See Royal Business Machines, Inc. v. Lorraine Corp., 633 F.2d 34, 45 (7th Cir.1980). The evidence in this case could plausibly give rise to (at least) two very different interpretations. The benign interpretation is that the Union representatives did not know what they were doing: they truly thought they could extend Bennett's probation under the agreement even though it had ended, and that such an extension was the product of "legitimate negotiations"; further, they had no idea that Bennett risked being fired four days later, and they considered their hands to be tied once Bennett's protected status had been altered. On this view, it would seem that the Union's conduct did not rise above some form of negligence.[7] But the other interpretation is not so benign: the Union representatives promised Bennett the protections of the Union and then, knowing that she was entitled to certain rights under the agreement, sacrificed her contractual rights and turned their backs on her at the May 19 meeting. Additionally, they knew the inevitable result of their action: she risked summary discharge and they would no longer have to represent her.
 
 
 43
 We think that both interpretations are permissible from the evidence. The district court, having weighed the evidence and made credibility determinations with the benefit of seeing and hearing the witnesses, chose to accept something closer to the latter view. The Union argues that there was "absolutely no evidence" of intentional misconduct or bad faith. We disagree. There may not have been any direct evidence of personal animosity toward Bennett. There was, however, significant evidence that Slater, the Union president, had knowledge of Bennett's contractual rights but nevertheless proceeded, along with other Union representatives, to give those rights way. First, there is the plain language of the collective bargaining agreement; we have already found the agreement to be unambiguous in conferring nonprobationary status that is not subject to revocation after the initial 30 days. Second, Ardath Drake warned the other Union representatives before and during the May 19 meeting that the Union had to take care of its members once the probationary period was over and they had been given their Union cards. Order at 6.[8] Third, Slater's issuance of the Union card on Bennett's 31st day of employment strongly suggests Slater's understanding that her probationary period had truly ended, and was not subject to reinstatement later. Order at 4. Fourth--and most persuasive--is Slater's specific denial to Bennett on May 15 that her probation would be extended: Williams has "had thirty days to take care of that." Id. This statement directly supports Slater's knowledge that the agreement disallowed precisely what Slater agreed to four days later: a retroactive extension of the probationary period. Finally, the district court found that both Slater and Williams attempted to conceal the retroactive decision by fabricating a decision to extend probation before May 15. Id. at 11-12. Their story fell apart, but the fabrication is probative of their knowledge of wrongfulness. See McCormick on Evidence § 273, at 808-10 (3d ed. 1984); United States v. Philatelic Leasing, Ltd., 601 F.Supp. 1554, 1565-66 (S.D.N.Y.1985), aff'd, 794 F.2d 781 (2d Cir.1986).
 
 
 44
 We also reject the Union's argument that there was no evidence that it engaged in deceitful conduct. First, under the cases cited earlier, including Steffens and Martin, a showing of specific misrepresentations or deceitful statements is not required for a union to breach its duty by depriving an employee of contractual rights. It is sufficient "deceit" for a union to turn its back on an employee deliberately and unjustifiably. See Graf, 697 F.2d at 778. Second, while there may not have been any direct misrepresentation by the Union to Bennett, there were acts of deceit: in essence, the Union told Bennett that she was nonprobationary and that it would represent her, it then agreed that she was probationary and refused to represent her and it then failed to inform her of her change in status.
 
 
 45
 We cannot say that the district court's findings of bad faith and intentional misconduct are clearly erroneous. We therefore agree with the district court that the Union breached its duty of fair representation.
 
 B. Damages
 1. Attorney's Fees
 
 46
 The Company and the Union challenge the district court's award of attorney's fees as an element of compensatory damages. At least five circuits have held that when an employer has breached its labor contract and the union fails in its duty of fair representation, the worker may recover as compensatory damages not only backpay, but also attorney's fees reasonably incurred to press the claim against the employer. Ames v. Westinghouse Elec. Corp., 864 F.2d 289, 293 (3d Cir.1988); Self v. Drivers, Chauffeurs, Warehousemen & Helpers Local Union No. 61, 620 F.2d 439, 444 (4th Cir.1980); Del Casal v. Eastern Airlines, Inc., 634 F.2d 295, 301-02 (5th Cir.), cert. denied, 454 U.S. 892, 102 S.Ct. 386, 70 L.Ed.2d 206 (1981); Allen v. Allied Plant Maintenance Co. of Tennessee, 881 F.2d 291, 298-99 (6th Cir.1989); Zuniga v. United Can Co., 812 F.2d 443, 454-55 (9th Cir.1987). There are apparently no cases to the contrary. The reasoning of these cases is straightforward and persuasive: "When there is a legal duty to provide representation, whether that duty arises out of a contractual undertaking or, as here, by operation of law, if the representation is wrongfully withheld, the cost of substitute representation should be recoverable damages." Ames, 864 F.2d at 293.
 
 
 47
 We do not agree with the Union's contention that this rule is a "judicially created exception" to the American rule against fee-shifting. A central purpose of the American rule is to avoid penalizing the losing party simply because it chose to defend or prosecute a lawsuit. See Summit Valley Industries, Inc. v. Local 112, United Bhd. of Carpenters, 456 U.S. 717, 724, 102 S.Ct. 2112, 2116, 72 L.Ed.2d 511 (1982). In the present context, however, the fees are not awarded as a penalty, but rather as proximate consequential damages for the union's failure to provide representation: the expense that Bennett has incurred in pursuing her contractual grievance against the Company "is not merely a result of the harm that [the Union] did [her]; it is the harm itself." Dutrisac v. Caterpillar Tractor Co., 749 F.2d 1270, 1275 (9th Cir.1983).[9] To avoid conflict with the American rule, courts generally limit fees awarded as damages in hybrid section 301 cases to the expenses incurred in pursuing the claim against the employer, and not the claim against the union. See, e.g., id. at 1275 & n. 3; Ames, 864 F.2d at 293. Here, however, the employer and the Union participated in each other's breach; indeed, the Company's breach of the labor contract in this case depended upon the Union's abandonment of its representation. Because we agree with the district court that the fees incurred in both components of this hybrid action were "necessarily intertwined," we conclude that the award of all reasonable attorney's fees as damages was proper.
 
 2. Joint and Several Liability
 
 48
 The district court ordered that liability for backpay and attorney's fees be joint and several because both defendants participated in each other's breach. The Company argues that damages should have been apportioned between the Union and the Company. The general rule in hybrid section 301 cases, as stated in Vaca, 386 U.S. at 197, 87 S.Ct. at 920, and Bowen v. United States Postal Serv., 459 U.S. 212, 230, 103 S.Ct. 588, 599, 74 L.Ed.2d 402 (1983), is that damages should be apportioned. "The employer is liable for any damages preceding the time an arbitrator would have reinstated the employee, had the union done its duty." Camacho v. Ritz-Carlton Water Tower, 786 F.2d 242, 245 (7th Cir.), cert. denied, 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986).
 
 
 49
 At least two circuits have held, however, that joint and several liability is appropriate when the union or the employer has participated in or caused the other's breach. Allen, 881 F.2d at 298-99; Baskin v. Hawley, 807 F.2d 1120, 1132-33 (2d Cir.1986). As those courts noted, in both Vaca and Bowen the Supreme Court made clear in applying the apportionment rule that "this is not a situation in which either the union or the employer has participated in the other's breach." Bowen, 459 U.S. at 223 n. 11, 103 S.Ct. at 595 n. 11; see also Vaca, 386 U.S. at 197 n. 18, 87 S.Ct. at 920 n. 18. The rationale behind apportionment of damages disappears when each party plays an active role in the other's breach. In such circumstances it is no longer "unjust" to hold either party accountable for the entire period of injury. See Bowen, 459 U.S. at 223, 103 S.Ct. at 595. The district court found that the Company and the Union had colluded in acting wrongfully:
 
 
 50
 Each aided the other by affirmatively and fraudulently depriving Bennett of her protected status as a union member and an employee of the Company. As a result, the Union was a cause of the breach of contract and the Company was a cause of the breach of the duty of fair representation.
 
 
 51
 Order at 28-29. We agree with the district court's imposition of joint and several liability in this case.[10]
 
 III.
 
 52
 For the foregoing reasons, the judgment of the district court is
 
 
 53
 AFFIRMED.
 
 
 
 *
 The Honorable Albert J. Engel, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, is sitting by designation
 
 
 [1]
 These facts are based upon the district court's findings. See Order on Merits After Bench Trial (S.D.Ind. Sept. 5, 1990). The Union disputes the district court's conclusion that it acted in bad faith. On appeal, however, neither the Union nor the Company challenges the district court's specific subsidiary factual findings underlying its findings on "ultimate issues."
 
 
 [2]
 The parties stipulated to trial without a jury. An employee seeking backpay in a section 301 case has the constitutional right to a jury trial. Chauffeurs, Teamsters & Helpers Local No. 391 v. Terry, 494 U.S. 558, 561, 110 S.Ct. 1339, 1342, 108 L.Ed.2d 519 (1990)
 
 
 [3]
 We also agree with the district court that the fact that the drug tests had not taken place during the first 30 days does not change the analysis. The agreement required that an extension for whatever reason must occur during the first 30 days of employment, if at all. The court found as a fact that no such extension was made during the first 30 days, and we see no error, clear or otherwise, in this finding
 
 
 [4]
 Slater also testified that employees "go in [to the Union] after 30 days unless the probationary period is extended for another 30 days." Record, Tr. at 134 (emphasis added). The idea of adding 30 days in the context of a 60-day extended probation only makes sense if the extension occurs at the 30-day point or before. In addition, Bennett's May 17 warning from the Company noted that "it is also on record that there was an unexcused absence while being a probationary employee." Order at 5 (emphasis added). This suggestion that Bennett was no longer on probation is in tension with the notion that employees were effectively on probation for 60 days. Finally, while there was undisputed evidence that probation had been extended on several prior occasions, there was no evidence that any prior extension had been made retroactively, i.e., after the initial 30-day period
 
 
 [5]
 The intentional misconduct rule of this circuit was first stated in Hoffman v. Lonza, Inc., 658 F.2d 519, 522 (7th Cir.1981), in which the court interpreted Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), to require evidence of "fraud, deceitful action or dishonest conduct." Ours is apparently the only circuit to require proof of intentional misconduct. See Thomas v. United Parcel Serv., Inc., 890 F.2d 909, 922 n. 5 (7th Cir.1989) (citing cases)
 
 
 [6]
 Bad faith and intentional misconduct are frequently run together as involving essentially the same inquiry. See, e.g., Dober, 707 F.2d at 294-95; Superczynski, 706 F.2d at 203. The two concepts are certainly closely related, though bad faith is presumably somewhat narrower. A finding of bad faith generally implies intentional misconduct, while the converse is not necessarily true. (Theoretically, Vaca 's other two components besides bad faith--arbitrary and discriminatory actions--must also meet the intentional misconduct standard in this circuit.) As a practical matter, though, findings of bad faith and intentional misconduct tend to go hand in hand. The district court made findings of both bad faith and intentional misconduct on the part of the Union. In adopting standards applicable to the duty of fair representation, the cases have generally treated the two concepts as part of a single inquiry, so we also treat them together
 
 
 [7]
 Given our conclusion as to the unambiguous meaning of the collective bargaining agreement, however, one might also argue that even on this view the Union's conduct was so egregious as to constitute extreme recklessness indistinguishable from intentional misconduct. See Graf, 697 F.2d at 778
 
 
 [8]
 Prior to the May 19 meeting, Ardath Drake said to Slater: "I hate to see anybody lose their job, but once she's in the union, we've got to take care of her, now, you know that." Drake Dep. at 38-39. During the May 19 meeting, Drake made the following statements:
 I'm not going to give you an extension on the new people.... They've been carrying their union cards around for five or six days.... He can't go ask for those union cards back.
 ... Cherie Bennett's been to a union meeting. She's filed a first step grievance. These people are in the union.... Besides that, you might fire Cherie Bennett.... I told Jay Slater before her thirty days were up, that he better do something then, because once she was in, we had to take care of her.
 Id. at 46-47, 49.
 
 
 [9]
 Summit Valley is not to the contrary. In that case the Supreme Court held that attorney's fees are not recoverable as damages in a suit brought under section 303 of the LMRA, 29 U.S.C. § 187, which authorizes an action for an employer that has been injured by a union's unfair labor practice. But as the Ninth Circuit has observed, the Court rested its decision on factors peculiar to section 303(b), which--unlike section 301--expressly states its remedies and was not intended to encompass attorney's fees, according to the "persuasive evidence" of congressional intent. See Zuniga, 812 F.2d at 454-55 (citing Summit Valley, 456 U.S. at 723, 102 S.Ct. at 2115). Moreover, since a union does not owe a duty of fair representation to the employer, the latter's expense incurred in obtaining legal representation is not "the harm itself." Allowing recovery of fees under section 303, therefore, would be a true exception to the American rule
 
 
 [10]
 We also reject the Company's argument that if attorney's fees are awarded it should not be liable for them. Like the court in Allen, we conclude that because of its active participation in the Union's breach of the duty of fair representation, the Company's liability for damages extends to attorney's fees as well as backpay